209 P.3d 435 (2009)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Stephen K. EUGSTER, an attorney at law.
No. 200,568-3.
Supreme Court of Washington, En Banc.
June 11, 2009.
*438 Shawn Timothy Newman, Attorney at Law, Olympia, WA, Kris J. Sundberg, Law Office of Kris J. Sundberg, Mercer Island, WA, for Petitioner.
Jonathan Henry Burke, Washington State Bar Assoc., Seattle, WA, for Respondent.
CHAMBERS, J.
¶ 1 Stephen K. Eugster practiced law for 34 years without a history of discipline.[1] Then the Washington State Bar Association (WSBA) charged Eugster with nine counts of attorney misconduct based on Eugster's filing a guardianship petition against his former client without any investigation as to her alleged incompetency and failing to abide by the objectives of the representation. The hearing officer and Disciplinary Board of the Washington State Bar Association (Board) concluded Eugster violated eight current and former Rules of Professional Conduct (RPC). The hearing officer recommended disbarment. A unanimous Board agreed but amended several of the hearing officer's findings of fact.
¶ 2 Eugster challenges 12 findings of fact. He also argues the Board erred in recommending disbarment because his actions were defensible under former RPC 1.13 (1985) and because the Board ignored mitigating factors that would lessen his sanction. The WSBA argues the court should affirm the findings of fact and conclusions of law and disbar Eugster. We conclude that Eugster's misconduct does not merit disbarment but suspend him for 18 months and impose additional conditions.

FACTS
¶ 3 Due to the way this case has been framed, we find it necessary to discuss the facts in some detail in order to properly resolve the issues presented. Marion Stead hired Eugster in June 2004. When Mrs. Stead contacted Eugster, she was 87 and had recently moved into the Parkview Assisted Living Facility after the death of her husband, John. This was not the first time Eugster worked for the Stead family. In the early 1990s, Eugster represented Mrs. Stead's only child, Roger Samuels,[2] in the dissolution of his marriage. According to the evidence submitted by the WSBA, Mrs. Stead's objective in contacting Eugster in June 2004 was to remove Roger from his position of control over her affairs and to assist her with estate planning.
¶ 4 In 2003, before John's death, the Steads had executed new wills drafted by attorney David Hellenthal. Under the Hellenthal wills, Roger would inherit the Stead home and his daughter, Emilie, would be the beneficiary of a residual trust. The Hellenthal wills also created a supplemental needs trust for the surviving spouse and named Roger as trustee. As trustee of the supplemental needs trust, Roger had discretion to make or withhold payments so long as it did not disqualify Mrs. Stead from any other assistance. The wills specified the trust was irrevocable and could not, absent a court order, be changed.
¶ 5 In late 2003, dissatisfied with the Hellenthal wills, Mrs. Stead contacted attorney Summer Stahl. Stahl changed the beneficiary of a life insurance policy from Roger back to Mrs. Stead but performed no other services. When Roger discovered that Mrs. Stead had hired Stahl, he became "very upset." Amended Findings of Fact (AFOF) 2.14.1. Roger saw his mother's consultations with Stahl as a betrayal of family trust and questioned her competence. In January 2004, Roger had Dr. Duane Green, a psychologist, examine his mother for testamentary capacity. Dr. Green noted an "`interpersonal issue between Ms. Stead and her son'" and generally observed that she seemed "`"desperate," as she had no access to funds.'" Resp't's Ex. 88, at 17 (quoting Dr. Green). Dr. Green concluded Mrs. Stead was upset over the illness of her husband but had testamentary capacity.
*439 ¶ 6 Upon John's death in February 2004, Roger became the personal representative of John's estate and acted as trustee of the supplemental needs trust for the benefit of Mrs. Stead. Roger also assumed control over the payment of bills because he did not believe his mother was capable of doing so. During this time the relationship between Roger and his mother continued to deteriorate. From the record it appears that Mrs. Stead felt Roger was manipulating her estate and denying her adequate funds so that he could preserve more for himself and his daughter after her death. In particular, Mrs. Stead felt that she had an adequate estate and did not like the idea of being forced to receive Medicaid benefits and not being permitted to have sufficient spending money. Mrs. Stead and her son's relationship became even more strained as Roger continued to refuse her requests for money. Mrs. Stead hoped removing her son from authority over her affairs would help mend their relationship.
¶ 7 In June 2004, Mrs. Stead hired Eugster to "short circuit" Roger's control over her affairs and also to retrieve certain items of personal property from Roger. Eugster had Mrs. Stead revise her estate planning scheme by creating a revocable living trust for her and recommending that she be her own trustee. On June 30, 2004, Eugster wrote to Mrs. Stead saying, "It would be my recommendation that if you like the estate plan which I have drafted for you, that you continue as the trustee of your estate with perhaps help and direction from me." Resp't's Ex. 33. Mrs. Stead was named the trustee with Eugster serving as successor trustee and Roger as secondary successor trustee. To protect Mrs. Stead consistent with the existing testamentary trust and consistent with her desire that Roger not control her finances, Eugster was given power of attorney both generally and for health care. Eugster contends he reluctantly agreed to so serve as representative and successor trustee after expressing concerns in a letter to Mrs. Stead. Roger served as successor to Eugster in both roles. Eugster testified that installing Roger as second successor trustee enabled Eugster to monitor Roger and prevent him from doing anything untoward against Mrs. Stead's estate without going through Eugster.
¶ 8 In July 2004, Eugster met with Roger to discuss the supplemental needs trust created by John's will. He also consulted with Mrs. Stead's financial planner regarding her suspicion that the supplemental needs trust was overfunded.[3] Eugster made preparations to sell the Stead family home. As to recovering Mrs. Stead's personal property, Eugster located the items she requested but assured her by letter that Roger was keeping them safe. In August, Eugster wrote Mrs. Stead to assure her of Roger's good intentions toward her and recommended Roger resume control over her affairs:
Roger has been a good and dutiful son to you. I have to be honest about this. You can be proud of Roger. He is not acting to protect himself or to take things from you. He has been acting to ensure that you are taken care of, your bills are paid, your assets are protected, and that you do not have to have unwanted concerns for your welfare as you grow older.
Frankly, you should be very proud of Roger.
. . . .
But, I think you should give serious thought to making Roger the successor trustee to your Trust and the person holding your power of attorney.
Resp't's Ex. 52, at 2-3.
¶ 9 In September 2004, Mrs. Stead received another letter from Eugster, suggesting the two of them meet and include Roger. Although Mrs. Stead did not communicate her displeasure to Eugster, it is clear from the record that she was not happy with his response. She responded by seeking the counsel of another attorney, Andrew Braff, who testified that Mrs. Stead wanted to know whether Eugster was representing her or *440 Roger. On September 9, 2004, Braff wrote Eugster notifying him that Braff now represented Mrs. Stead and explicitly revoking Eugster's power of attorney. Eugster responded on September 13, 2004, by letter stating:
I do not believe that Marion R. Stead is competent. A guardianship should be established for her person and her estate or at least her es[t]ate. Please be advised that I do not recognize that you have been retained to represent her or that the revocation of power of attorney is effective.
Resp't's Ex. 59. Braff then sent a letter dated September 17, 2004, informing Eugster that his "services as Marion Stead's attorney are terminated, and Mrs. Stead wants her files forwarded to this office." Resp't's Ex. 60. In addition, the letter stated "Marion Stead fully expects any and all communications with you to remain confidential and not to be passed on to Roger Samuels." Id. Braff also asked Eugster to advise him of any changes in Marion's competence since the execution of her trust in July where witnesses testified she was of sound mind. Around the same time, Mrs. Stead removed Eugster as successor trustee of her trust and named Stephen Trefts, doing business as Northwest Trustee and Management Services instead.
¶ 10 Eugster states that he believed Mrs. Stead to be a vulnerable senior and that he decided to take action when he learned that Mrs. Stead had hired Trefts. Under the durable general power of attorney prepared by Braff, Northwest Trustee and Management Services was entitled to reimbursement for all costs and expenses and "shall be entitled to receive at least annually, without court approval, reasonable compensation for services performed on the principal's behalf." Resp't's Ex. 58, at 4 (emphasis added). On October 8, 2004, Trefts informed Roger that Mrs. Stead had resigned as trustee and had named Trefts as successor. Braff and Trefts also attempted to get Roger, as trustee of John Stead's Testamentary trust, to pay $2,000 per month to them for "one-half of her support."[4] Board Ex. 55. Eugster deemed the requested payment improper under the special needs trust.[5]
¶ 11 On September 27, 2004, Eugster petitioned the court to appoint a guardian for Mrs. Stead. Eugster filed the guardianship action pursuant to former RPC 1.13, which provided in part: "(b) When the lawyer reasonably believes that the client cannot adequately act in the client's own interest, a lawyer may seek the appointment of a guardian or take other protective action with respect to a client."[6] Eugster signed his name on the line marked "Petitioner/Attorney" and represented that he was the current attorney for Mrs. Stead. Resp't's Ex. 64, at 6. Roger served as copetitioner at the behest of Eugster, and Roger provided some of the information for the petition. Eugster disclosed to Roger his belief that Mrs. Stead lacked competence. Roger eventually hired an attorney to represent him in the guardianship proceeding.
¶ 12 The petition listed Mrs. Stead's personal and financial information, and characterized Mrs. Stead as unable to manage her person and estate and that she had difficulty monitoring her medications, investments, and expenses. It also described Mrs. Stead as "delusional" because she believed "her son Roger Samuels is somehow out to take advantage of her when this is certainly not the case." Id. at 2. In the petition, Roger was nominated to act as Mrs. Stead's guardian. *441 The petition for appointment of a guardian was served on Mrs. Stead in the common room of Parkview, which humiliated her.
¶ 13 Eugster filed the petition based upon his personal judgment without conducting any formal investigation into Mrs. Stead's medical or psychological state. There is no evidence Eugster consulted Mrs. Stead's healthcare providers or talked with people in the Parkview community. Eugster testified that Mrs. Stead had told him she had seen a doctor in the last six months for a "sanity test" and was aware that she had been examined by Dr. Green before his representation began. Three months before he filed the petition for appointment of a guardian for Mrs. Stead, Eugster had Mrs. Stead sign a new trust, powers of attorney, and a will he had prepared,[7] indicating he had no concerns about her testamentary capacity at that point. The last date that either Eugster or Roger personally talked to Mrs. Stead was on August 3, 2004, nearly two months before filing the petition.
¶ 14 Eugster offered evidence to support his contention that he at all times was motivated to act on behalf of his client's best interest and not to control her trust. According to Eugster, he believed that his client was elderly, vulnerable, and unable to understand her financial affairs, and perhaps being taken advantage of. He tells us he felt an obligation as her attorney to protect her. She was nearly 88 years old when she contacted Eugster. She was confused about her rights under a complex estate plan, and she did not like the plan created by Hellenthal. Eugster sought to develop a plan to address her concerns, including determining whether there was a legitimate basis for those concerns. Eugster argues Mrs. Stead's desire to contest her late husband's will, her frequent and repetitive inconsequential communications with Eugster's office, and her continued lack of understanding of how her bills were being paid under the irrevocable special needs trust all support his contention.
¶ 15 Eugster appeared before a judge seeking appointment of a guardian on October 19, 2004. He assured the court he had reviewed the ethical issues involved with him seeking to appoint a guardian. He told the court he believed his actions were ethically viable, and the court asked Eugster to brief the issue. Eugster did not supply a brief but instead, two days later, declined his power of attorney.
¶ 16 By letter dated October 21, 2004, Eugster purported to decline his service as successor trustee over Mrs. Stead's trust and as attorney in fact. Trefts replied, stating Eugster's declination was unnecessary given that Mrs. Stead had terminated Eugster's services and amended the trust to appoint Trefts as successor trustee.
¶ 17 On October 26, 2004, the guardian ad litem (GAL) appointed to evaluate Mrs. Stead concluded she was not suffering from any incapacity and was capable of handling her own affairs.[8] He noted Mrs. Stead's *442 strained relationship and distrust of Roger. The GAL concluded Mrs. Stead did not need a guardian but, if the court did appoint one, the guardian should not be Roger.
¶ 18 On November 17, 2004, Eugster withdrew his signature from the guardianship petition. By stipulation of the parties, the court dismissed the guardianship petition on February 1, 2005. Mrs. Stead paid $13,500 to defend herself in the guardianship action

PROCEDURAL HISTORY
¶ 19 On February 10, 2005, Braff signed a detailed grievance against Eugster. The grievance was also signed, "Approved By" Marion Stead. Clerk's Papers (CP) at 426-28. The WSBA filed a complaint with the Board, under ELC 10.3, charging Eugster with nine counts of misconduct.[9] The WSBA dismissed two counts before the disciplinary hearing. Relevant here, the hearing officer found a clear preponderance of the evidence supported all seven remaining counts.

A. Count one: violation of former RPC 1.2(a)[10]
¶ 20 As to count one, the hearing officer determined Eugster failed to abide by his client's objectives in violation of former RPC 1.2(a) (1985) in two ways. First, Eugster sought to appoint Roger guardian over Mrs. Stead despite the fact she had directed Eugster to remove Roger from control over her affairs. Second, Eugster failed to reclaim property he knew to be in Roger's control that Mrs. Stead requested Eugster recover. The hearing officer determined Eugster's state of mind was knowing and intentional because he knew Mrs. Stead did not want Roger in control of her affairs and Eugster sought personal gain from being in control of her trust. The hearing officer determined Eugster's violation of former RPC 1.2(a) resulted in injury to Mrs. Stead because she lost contact with her son and spent $13,500 to defend against the guardianship. The hearing officer considered whether any aggravating or mitigating factors applied. As for aggravating factors, the hearing officer found Eugster committed multiple offenses, refused to acknowledge the wrongful nature of his conduct, Mrs. Stead was a vulnerable victim, and Eugster had substantial experience in the practice of law and working with elderly clients. The hearing officer found one mitigating factor: no prior disciplinary history.[11] Applying American Bar Association's Standards for Imposing Lawyer Sanctions std. 7.1 (1991 Ed. & Supp.1992) (ABA Standards), the hearing officer concluded the presumptive sanction for count one was disbarment.

B. Count two: violation of former RPC 1.6(a)[12]
¶ 21 The hearing officer found Eugster violated former RPC 1.6(a) (1990) by "disclosing to Roger and other third parties confidential communications between himself *443 and Ms. Stead, and his impression of her during the representation." CP at 2131. The findings do not state what specific communications Eugster disclosed. Rather, the findings refer to Eugster's assertions in his guardianship petition that Mrs. Stead was "delusional" and "not capable of managing [her affairs]." CP at 2120. The hearing officer determined that Eugster's state of mind was knowing and intentional because he made the disclosures in direct contravention of Mrs. Stead's stated objective to be free of Roger's control. Applying ABA Standards std. 4.2, the hearing officer concluded the presumptive sanction for count two was suspension.

C. Count three: violation of former RPC 1.8(b)[13] and 1.9(b)[14]
¶ 22 The hearing officer found Eugster violated former RPC 1.8(b) (2000) and former RPC 1.9(b) (1985) when he sought to appoint Roger as guardian, served Mrs. Stead with guardianship papers in the common room at Parkview, and caused her to spend $13,500 litigating the action. The hearing officer then referred to count two.

D. Count four: violation of former RPC 1.9(a)[15]
¶ 23 The hearing officer found Eugster violated former RPC 1.9(a) (1985) when he "used information gained in the estate planning representation to file a guardianship appointing Roger as guardian." CP at 2132-33. Again, the findings do not tell us what information was used other than referring to the statement in the guardianship petition that the petitioner "`has witnessed Mrs. Stead's lack of ability and capability in managing her affairs.'" Findings of Fact (FOF) 2.32. The hearing officer determined Eugster acted knowingly to the detriment of Mrs. Stead when he filed his petition for guardianship despite arguing she was competent at the time she executed a trust (drafted by Eugster) naming Eugster successor trustee. Applying ABA Standards std. 4.32, the hearing officer concluded the presumptive sanction for count four was suspension.

E. Count five: violation of former RPC 1.15(d)[16]
¶ 24 The hearing officer found Eugster violated former RPC 1.15(d) (1985) by not "surrendering papers and property to which the client is entitled, and by refusing to turn over Ms. Stead's client file to Mr. Braff until after the guardianship was dismissed." CP at 2133. The hearing officer determined Eugster acted knowingly because he failed to return Mrs. Stead's file despite several requests. The hearing officer concluded Eugster's violation of former RPC 1.15(d) imposed extra cost upon Mrs. Stead for her new attorney to recreate the file and attendant estate planning documents. Applying ABA Standards std. 4.12, the hearing officer concluded that the presumptive sanction for count four was suspension.

F. Counts six and seven were dismissed by the WSBA before the hearing.

G. Count eight: violation of former RPC *444 3.4(c)[17]
¶ 25 The hearing officer found Eugster violated former RPC 3.4(c) (1985) by "filing the petition for guardianship without making a reasonable inquiry about Ms. Stead's mental condition." CP at 2134. The hearing officer determined Eugster acted knowingly. The hearing officer concluded Eugster's manipulation of the judicial system in violation of former RPC 3.4(c) injured Mrs. Stead, the public, and the legal profession. Applying ABA Standards std. 6.21, the hearing officer concluded the presumptive sanction for count eight was disbarment.

H. Count nine: violation of former RPC 8.4(d) (2002)[18]
¶ 26 The hearing officer found Eugster violated RPC 8.4(d) by refusing to recognize he had been fired by Mrs. Stead and filing a guardianship petition against his former client. The hearing officer determined Eugster acted knowingly and intentionally when he filed the guardianship petition and knowingly when he involved Roger as copetitioner in the guardianship action against Mrs. Stead's stated objectives as Eugster's client. The hearing officer concluded Eugster's violation of former RPC 8.4(d) cost Mrs. Stead her relationship with Roger, $13,500 to contest the guardianship, and injured the public and legal profession. Applying ABA Standards std. 7. 1, the hearing officer concluded the presumptive sanction for count eight was disbarment.
¶ 27 By unanimous vote, the Board amended portions of the hearing officer's findings of fact and adopted the recommendation to disbar Eugster. Eugster timely sought review of the Board's order.[19]

ANALYSIS
¶ 28 "This court bears the ultimate responsibility for lawyer discipline in Washington." In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 753-54, 82 P.3d 224 (2004) (citing In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 607, 9 P.3d 193 (2000)). We give "considerable weight to the hearing officer's findings of fact, especially with regard to the credibility of the witnesses, and we will uphold those findings so long as they are supported by `substantial evidence.'" In re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 208, 125 P.3d 954 (2006) (citing In re Disciplinary Proceeding Against Guarnero, 152 Wash.2d 51, 58, 93 P.3d 166 (2004)). "We give great weight to a hearing officer's determination of an attorney's state of mind because it is a factual finding." In re Disciplinary Proceeding Against Trejo, 163 Wash.2d 701, 722, 185 P.3d 1160 (2008) (citing In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 744, 122 P.3d 710 (2005)). However, we review a hearing officer's conclusions of law de novo. Id. at 717, 185 P.3d 1160. On mixed questions of law and fact, this court effectively applies a sliding scale of deference. The more the question involves the application of law, the less likely we are to give deference.

CHALLENGES TO FINDINGS
¶ 29 Eugster challenges 12 findings of fact.[20] He generally challenges the original and amended findings of fact as "confusing, *445 incomplete, misleading or erroneous," and as speculative and not supported by substantial evidence. Opening Br. of Appellant, App. A at 43. Most of Eugster's challenges simply add detail to the hearing officer's findings or are based upon his interpretation of the evidence.
¶ 30 Many challenges focus on Eugster's view of Mrs. Stead's objective in retaining him. For example, Eugster argues that it was not contrary to Mrs. Stead's objectives to name Roger as her guardian as she had nominated him as such under her previous will. According to Eugster, Mrs. Stead simply wanted to make sure Roger was not taking advantage of her and his actions accomplished her goals. He asserts, "That is what she wanted. Marion wanted Eugster to take over things at least for the time being to ensure her son was not taking advantage of her." Id. at 44. One of her goals was to preserve the estate, and it made no sense to pay Eugster to do the daily work when Roger was doing it at no expense to the estate. Eugster testified, "[M]y goal was to really get things in my control so that if Roger was doing something untoward regarding his mother's estate, it wouldn't happen." Verbatim Report of Proceedings at 780. Eugster testified that one of the reasons he was named the successor trustee and Roger was the secondary successor trustee was to ensure Roger "would have to go through [Eugster]." Id. Eugster believes he made efforts to bring Roger and his mother closer together and did not destroy their relationship.
¶ 31 Eugster also challenges several findings based upon his view that he was motivated to file the guardianship petition out of his concern about the potential exploitation of a vulnerable adult client. Eugster argues he sought to develop a plan to address these issues, including determining whether there was a legitimate basis for his concerns. However, we note that neither do the findings conclude, nor does the WSBA contend, that Eugster did not subjectively believe that Mrs. Stead was incompetent. They conclude only that Eugster failed to make a reasonable investigation into Mrs. Stead's competency before filing the guardianship petition and that Eugster acted with knowledge and intent to control the estate. Although the WSBA does not explain why Eugster first recommended that Mrs. Stead act as her own trustee and later Roger act as successor trustee, or why Eugster invited Roger to participate in the guardianship petition if his goal was to control her estate, the record does reflect that Eugster was to serve as successor trustee should Mrs. Stead "resign, become incompetent or die." Resp't's Ex. 36, at 9. Therefore, substantial evidence supports that Eugster would have been trustee had Mrs. Stead been found incompetent.
¶ 32 Additionally, Eugster contends that he did not disclose Mrs. Stead's confidential communications but rather based his statements in the guardianship petition on his general observationsobservations he believes should have been obvious to anyone. However, the guardianship petition prepared and signed by Eugster did contain personal information about Mrs. Stead including her address, date of birth, a generalized description of her health and medications, and a list of her assets and the approximate value of those assets. It is unlikely Eugster would have such personal information unless she had provided it to him in connection with his activities as her lawyer.
¶ 33 While the evidence may have well supported Eugster's interpretations, the hearing officer and the Board arrived at different conclusions. Those conclusions are supported by substantial evidence. We will not overturn findings "based simply on an alternative explanation or version of the facts previously rejected by the hearing officer and Board." In re Poole, 156 Wash.2d at 212, 125 P.3d 954. We decline to disturb the hearing officer's and Board's finding that the seven counts were proved by a clear preponderance of the evidence.[21]

SANCTIONS
¶ 34 We employ the ABA Standards as a basic, but not conclusive, guide to *446 determine the appropriate sanction for attorney misconduct. In re Disciplinary Proceeding Against Burtch, 162 Wash.2d 873, 896, 175 P.3d 1070 (2008). The "standards are designed to promote thorough, rational consideration of all factors relevant to imposing a sanction in an individual case." ABA Standards at 1. "`The purpose of a disciplinary proceeding is not punitive but to inquire into the fitness of the lawyer to continue in that capacity for the protection of the public, the courts, and the legal profession.'" ABA Standards at 3 (quoting Ballard v. State Bar of Cal., 35 Cal.3d 274, 291, 673 P.2d 226, 197 Cal.Rptr. 556 (1983)). The ABA has recognized the vast variety of circumstances that might arise in each case of lawyer discipline and created an analytical framework to evaluate misconduct and guidelines for imposing sanctions. In re Disciplinary Proceeding Against Stansfield, 164 Wash.2d 108, 122, 187 P.3d 254 (2008). The guidelines were not intended to be rigid but designed to permit "flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct." ABA Standards std. 1.3.
¶ 35 The Board's recommended sanctions receive great deference. "`[W]e should not lightly depart from recommendations shaped by [the Board's] experience and perspective.'" In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 343, 157 P.3d 859 (2007) (alternations in original) (quoting In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983)). "The Board is `the only body to hear the full range of disciplinary matters' and has a `unique experience and perspective in the administration of sanctions.'" In re Cohen, 150 Wash.2d at 754, 82 P.3d 224 (internal quotation marks omitted) (quoting In re Anschell, 141 Wash.2d at 607, 9 P.3d 193). However, "we are not bound by the Board's recommendation." In re Marshall, 160 Wash.2d at 343, 157 P.3d 859. While we will not lightly deviate from the Board's recommendation, if raised, we still must consider two Noble factors before imposing sanctions. In re Disciplinary Proceeding Against Schwimmer, 153 Wash.2d 752, 764, 108 P.3d 761 (2005) (citing In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 66 P.3d 1057 (2003)). Those two factors are (1) proportionality of the sanction to the misconduct and (2) the extent of the agreement among the members of the disciplinary board. Id.
¶ 36 The ABA Standards lists four elements or factors the court should examine before imposing sanctions. After a finding of lawyer misconduct, a court should consider the following factors to determine the appropriate sanction: (a) the duty violated, (b) the lawyer's mental state, (c) the potential or actual injury caused by the lawyer's misconduct, and (d) the existence of aggravating or mitigating factors. ABA Standards std 3.0. Analytically, we have described how the court engages in a two-step process utilizing the ABA Standards. In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 195, 117 P.3d 1134 (2005). We first examine the duty violated, the state of mind, and the harm to the victim to arrive at a presumptive sanction. Id. Mitigating and aggravating factors are then considered to determine if the presumptive sanction should be modified. Id. No one factor is paramount. In determining the appropriate sanction, we examine the lawyer's misconduct as a whole and in context.[22] The court should consider the "appropriate weight of such factors in light of the stated goals of lawyer discipline" and should strive for "consistency in the imposition of disciplinary sanctions." ABA Standards std. 1.3.

*447 A. Duty

¶ 37 The duty or duties violated are important to evaluate the harm of the misconduct. "The extent of the injury is defined by the type of duty violated and the extent of actual or potential harm." ABA Standards at 6. "[T]he standards assume that the most important ethical duties are those obligations which a lawyer owes to clients." Id. at 5. A single act of misconduct may violate more than one ethical duty. The fact that the lawyer's misconduct has violated more than one duty may be relevant to the sanction.
¶ 38 When considering patterns of misconduct and multiple offenses, the ABA Standards focuses on the acts of misconduct rather than the number of duties violated because of that misconduct. Where there are multiple counts of misconduct, we focus on the most serious act in evaluating the appropriate sanction because the "`ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations.'" In re Schwimmer, 153 Wash.2d at 759, 108 P.3d 761 (internal quotation marks omitted) (quoting In re Disciplinary Proceeding Against Romero, 152 Wash.2d 124, 135, 94 P.3d 939 (2004)).
¶ 39 In evaluating Eugster's conduct, we are mindful that the WSBA parsed his misconduct into seven counts and that each count violated one or more duties. However, all of the ethical violations arise largely from just two acts of misconduct. By filing what has been determined to be a baseless petition for the appointment of a guardian for his client, the hearing officer and the Board concluded that Eugster violated the following duties: (1) he failed to abide by his client's objectives in violation of former RPC 1.2(a); (2) he disclosed client confidences in violation of former RPC 1.6(a); (3) he used information relating to the representation of his client to her disadvantage in violation of former RPC 1.8(b) and former RPC 1.9(b); (4) he represented himself, another person with interests materially adverse to his client, in violation of former RPC 1.9(a); and (5) by filing the petition without a reasonable investigation, he violated CR 11 and engaged in conduct that is prejudicial to the administration of justice in violation of former RPC 3.4(c).
¶ 40 In a separate but related act of misconduct of refusing to recognize that Mrs. Stead may not be incompetent, Eugster refused to accept that she had discharged him and retained new counsel. Based on this act the hearing officer and Board concluded he had violated the following additional duties: (6) he failed to surrender Mrs. Stead's files in violation of former RPC 1.15(d); and, (7) by representing to the court that he still represented Mrs. Stead, he engaged in conduct prejudicial to the administration of justice in violation of RPC 8.4(d).
¶ 41 The ABA Standards is designed to promote consideration of all factors relevant to imposing the appropriate level of sanction in an individual case. While the number of duties violated from a single act of misconduct may be useful, the ABA Standards is not based upon a mechanical tally of the number of code violations. Again, in arriving at a presumptive sanction, the ABA Standards focuses on the acts of misconduct and uses the analytical framework of examining the duty or duties violated, the harm or potential harm to the client, and the lawyer's state of mind.

B. State of Mind

¶ 42 To determine whether a lawyer breached an ethical duty "knowingly," we use the "knew or should have known" standard.[23] However, when assessing a lawyer's state of mind for purposes of imposing sanctions, we do not apply the "knew or should have known" standard. In re Stansfield, 164 Wash.2d at 127, 187 P.3d 254. To do so would eviscerate the negligence standard by forcing us to assume the lawyer should have *448 known the substantial risk of his actions rather than allowing us the flexibility to conclude that he simply failed to heed that substantial risk.[24]Id. Instead, when assessing a lawyer's mental state for purposes of imposing sanctions, we look to his state of mind relative to the consequences of his misconduct rather than the duty violated.[25]See id. at 123, 187 P.3d 254.
¶ 43 A lawyer's mental state toward the consequences of his actions may be either negligent, knowing, or intentional. ABA Standards at 6. The most culpable mental state is intent, defined as "when the lawyer acts with the conscious objective or purpose to accomplish a particular result." Id. The next most culpable mental state is knowledge, defined as "when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result." Id. When applying the ABA Standards, there can be a fine line between intentional and knowing conduct. In re Stansfield, 164 Wash.2d at 124, 187 P.3d 254. It is often very difficult to distinguish between conscious awareness of the nature or attendant circumstance and conscious objective or purpose to accomplish a particular result. "[I]n cases where we have found an attorney acted with an intentional state of mind, generally the attorney's intent was to benefit herself or himself." In re Poole, 156 Wash.2d at 239, 125 P.3d 954.
¶ 44 In determining Eugster's state of mind, we reserve the right to determine how much weight to give the hearing officer's findings in arriving at the presumptive sanction. The hearing officer concluded that Eugster's state of mind was intentional with respect to counts 1, 2, and 9. The findings of intent in all three are based upon the same conclusion: that Eugster filed the guardianship action in order to maintain control over Mrs. Stead's trust and the fees it would generate. This conclusion appears to be derived more from the hearing officer's belief that only Eugster would benefit financially if Mrs. Stead were found to be incompetent rather than any finding of credibility regarding Eugster's motives. The hearing officer's findings regarding Count 1 are clear but appear to be somewhat contradictory. For example, if Eugster took control of Mrs. Stead's trust, it supports the hearing officer's conclusion that he did so to control Mrs. Stead's estate for his own gain. But if he failed to take control, then it supported the hearing officer's conclusion that he failed to accomplish Mrs. Stead's objective of removing Roger from control in violation of former RPC 1.2(a). The hearing officer concluded Eugster did both in Count I. The Board inserted an additional finding in an effort to clarify but without much success. AFOF 2.26.1. Neither finding explains why Eugster first recommended that Mrs. Stead act as her own trustee and later recommended to Mrs. Stead, "I think you should give serious *449 thought to making Roger the successor trustee to your Trust and the person holding your power of attorney." Resp't's Ex. 52, at 3. Had Mrs. Stead followed either of these recommendations, it would have removed or reduced the very control Eugster was found to have sought. Indeed, it was Eugster's act of recommending that Roger, not he, control the trust that led Mrs. Stead to discharge him.
¶ 45 If Eugster did act to control the trust, there is no contention that he failed to perform the work requested, did more work than was necessary, or charged more than he should have.[26] While Mrs. Stead's assets are described as substantial, they were valued at less than $500,000 in the guardianship petition. Finally, while finding that Eugster sought to control Mrs. Stead's estate, the hearing officer also found several times that Eugster substituted his judgment for that of his client. The finding that "Eugster substituted his judgment for hers" is consistent with Eugster's position that he was motivated to do what he subjectively believed to be in the best interest of his client, not that he was motivated to control her assets for his own benefit. Neither the findings nor the WSBA contradicts Eugster's contention that he subjectively believed Mrs. Stead was incompetent to manage her affairs. He is alleged only to have failed to perform an adequate investigation before filing the petition for guardianship. Although we agree that Eugster knew his actions might benefit himself financially, we give greater weight to the hearing officer's finding that Eugster's real failing was in substituting his judgment for that of his client.

C. Harm

¶ 46 The injury and potential injury to both Mrs. Stead and the integrity of the profession are substantial. Not only did Mrs. Stead expend $13,500 defending the guardianship petition, but she was also confronted with a lawyer whom she believed had completely betrayed her by having her declared incompetent. In addition, it appears that the already tenuous relationship between Mrs. Stead and her son was irreparably damaged as a result of these events. The injury to Mrs. Stead was serious and substantial.

D. Presumptive Sanction

¶ 47 To arrive at a presumptive sanction, we must examine Eugster's conduct as a whole and in context and evaluate his misconduct, his state of mind and the harm caused. Having done so, we note Eugster practiced law for 34 years without a disciplinary history, and his misconduct is isolated to a single client and a single legal action lasting over approximately two months, and does not fall within the type of conduct for which disbarment is usually imposed for a first offense. While we are generally reluctant to deviate from the Board's recommendation, after reviewing each of the factors together and in context, we conclude that disbarment is not the appropriate sanction.
¶ 48 However, Eugster's misconduct was serious. Eugster's most serious act of misconduct was to file a petition for the appointment of a guardian alleging that Mrs. Stead was incompetent with virtually no investigation. He acted almost entirely upon his own subjective judgment. As appropriately described by the hearing officer:
Ms. Stead wrote in a sworn statement in the guardianship she believed Mr. Eugster was taking the action for his financial gain. Mr. Eugster proffered a finding of fact that he took the actions because he knew best. This lack of understanding of the lawyer client relationship is telling. A lawyer is hired to help people avoid or solve problems, they serve at the pleasure of those who employ them. We are servants, not masters. We can cajole, wheedle, debate, and try to persuade, be we shall not substitute our judgment for the client's.
. . . .
Respondent fails to grasp the most fundamental tenant [sic] of law practice, serve your client, protect their confidences. The damage to the profession here is bad.
CP at 2139-40.
¶ 49 In filing the petition for guardianship, Eugster breached his duty to maintain his *450 client's confidences, used confidences to take action directly contrary to his client's interests, and created a nightmare for his client who had to spend $13,500 defending a petition to declare her incompetent brought by her former lawyer in whom she had placed her trust. However, Eugster's misconduct was the first in a long career. It involved only one client in one legal proceeding and lasted for approximately two months before he took steps to mitigate his actions. Looking at his misconduct in context, the duties breached, his state of mind and the harm or potential harm to his client and the legal profession, we find the appropriate presumptive sanction to be suspension.

E. Aggravating and Mitigating Factors

¶ 50 Once we determine the presumptive sanction, we next consider any aggravating or mitigating factors. In re Marshall, 160 Wash.2d at 342, 157 P.3d 859. The hearing officer found five aggravating factors: (1) dishonest or selfish motive, (2) multiple offenses, (3) refusal to acknowledge wrongful nature of conduct, (4) vulnerability of victim, and (5) substantial experience in the practice of law. The Board affirmed these aggravating factors. Eugster challenges the application of a "dishonest or selfish motive" as an aggravating factor.[27] Again, the hearing officer based her finding of dishonest or selfish motive upon her conclusion that Eugster had a financial interest in the guardianship petition because he would have gained "control over Ms. Stead's considerable estate" had the guardianship petition succeeded. FOF 3.11. The hearing officer also concluded from Eugster's proposed findings of fact that he "sought to substitute his judgment for his client's." Id. The evidence clearly supports a finding that Eugster substituted his judgment for that of his clients. The evidence is more equivocal as to his motive to take control over Mrs. Stead's finances. Again, while the hearing officer's finding of dishonest or selfish motive is supported by evidence, we give it less weight in determining the appropriate sanction.
¶ 51 The hearing officer applied only one mitigating factor: no prior disciplinary history. Eugster argues the Board ignored other mitigating factors but does not elucidate which mitigating factors apply in this circumstance. Except for the weight to be given, we accept the hearing officer's and Board's conclusions regarding aggravating and mitigating factors.

PROPORTIONALITY
¶ 52 After we determine the presumptive sanction in light of the relevant aggravating and mitigating factors, we consider whether the sanction is appropriate according to the Noble factors, but only if the disciplined attorney raises the issue. In re Disciplinary Proceeding Against Holcomb, 162 Wash.2d 563, 592, 173 P.3d 898 (2007). Only one Noble factor is relevant herethe proportionality of the sanction to the misconduct. In re Burtch, 162 Wash.2d at 900, 175 P.3d 1070. Eugster asks the court to consider our decisions in In re Burtch, In re Marshall, In re Poole, and In re Stansfield. Opening Br. of Appellant at 39-41; Appellant's Statement of Additional Authorities. The WSBA argues these cases are not sufficiently analogous to prove disbarment is not proportionate. Answering Br. of WSBA at 49.
¶ 53 Disbarment is the most severe sanction. We have historically reserved disbarment for grievous acts of ethical misconduct. Disbarment has generally been applied to four categories of misconduct: (1) the commission of a felony of moral turpitude, In re Disciplinary Proceeding Against *451 Day, 162 Wash.2d 527, 173 P.3d 915 (2007) (first degree child molestation); In re Disciplinary Proceeding Against Stroh, 97 Wash.2d 289, 644 P.2d 1161 (1982) (tampering with a witness); In re Disbarment of Barnett, 35 Wash.2d 191, 211 P.2d 714 (1949) (bartering narcotics);[28] (2) forgery, fraud, giving false testimony and knowing misrepresentations to a tribunal, In re Burtch, 162 Wash.2d at 896, 175 P.3d 1070; In re Disciplinary Proceeding Against Whitney, 155 Wash.2d 451, 120 P.3d 550 (2005); In re Guarnero, 152 Wash.2d 51, 93 P.3d 166; In re Disciplinary Proceeding Against Whitt, 149 Wash.2d 707, 72 P.3d 173 (2003); In re Disciplinary Proceeding Against Miller, 149 Wash.2d 262, 66 P.3d 1069 (2003);[29] (3) misappropriation of client funds, In re Schwimmer, 153 Wash.2d 752, 108 P.3d 761; In re Disciplinary Proceeding Against VanDerbeek, 153 Wash.2d 64, 101 P.3d 88 (2004);[30] and, (4) extreme lack of diligence, In re Disciplinary Proceeding Against Anschell, 149 Wash.2d 484, 69 P.3d 844 (2003).[31] It would be unusual, perhaps unprecedented, to disbar a lawyer who does not have a disciplinary history for misconduct involving a single client in a single proceeding for conduct that lasted approximately two months unless it fell within one of these categories. Eugster's misconduct is not among those usually justifying disbarment. There is no contention that Eugster committed a felony involving moral turpitude, or engaged in forgery, fraud, giving false testimony or knowingly making misrepresentations to a tribunal; nor is there any allegation that he misappropriated client funds; nor has Eugster been guilty of extreme lack of diligence. Again, Eugster's misconduct involved a single client and a single legal action involving that client. The misconduct took place over a period of approximately two months after which time he took steps to correct or mitigate his misconduct. His misconduct began in late September 2004 when he refused to release Mrs. Stead's files to new counsel and filed the guardianship petition. By late October, he declined his service as successor trustee over Mrs. Stead's trust and as attorney in fact. On November 17, 2004, he withdrew his name from the guardianship petition. We agree that disbarment is disproportionate.

SUSPENSION
¶ 54 Generally, when we apply the sanction of suspension, we start with a minimum of six months. In re Trejo, 163 Wash.2d at 722, 185 P.3d 1160 (quoting In re Disciplinary Proceeding Against Lopez, 153 Wash.2d 570, 596 n. 11, 106 P.3d 221 (2005) (citing ABA Standards std. 2.3)). However, given the seriousness of Eugster's misconduct, the duties breached, the findings that he acted with knowledge and intent, the seriousness of the injury or potential injury, and four aggravating factors and only one mitigating factor, we conclude a suspension for 18 months is the appropriate sanction. Eugster should also pay restitution to Mrs. Stead's estate in the amount of $13,500.
¶ 55 While not condoning Eugster's actions in any way, we are concerned *452 that this matter might send the wrong message to lawyers who represent the elderly whether they specialize in elder law or are general practitioners who have represented a family or a client for many years. Issues of a client's competency arise in many forms. However, one scenario which is regrettably not uncommon is for a person of advanced years to fall under the influence of a friend, neighbor, or distant family member. It may come to the attention of a lawyer that an impaired client has fallen under such influence. Often, the friend or distant family member has taken the client to his or her own lawyer who has prepared a new will cutting out other family members and frustrating careful estate planning. Under such circumstances, if the lawyer reasonably believes that her client is suffering diminished capacity and is under undue influence, the lawyer may take protective action under RPC 1.14 without fear of provoking charges of ethical misconduct by the WSBA seeking disbarment. A lawyer's decision to have her client declared incompetent is a serious act that should be taken only after an appropriate investigation and careful, thoughtful deliberation.
¶ 56 We emphasize that Eugster's actions are distinguishable. First, Eugster failed to make any reasonable inquiry into Mrs. Stead's competency. Second, he knew or had information available to him to suggest Mrs. Stead had a "sanity" or mental status exam and was determined to be competent within six months of filing the guardianship petition. Third, it seems uncontroverted that Eugster believed Mrs. Stead was competent just months before he filed the guardianship petition, when she signed the estate planning documents Eugster prepared for her. Finally, Eugster fails to explain why his epiphany that his client was incompetent seems to have occurred on the very day he discovered that she had retained new counsel and wanted to discharge him. Lawyers who act reasonably under RPC 1.14 are not subject to discipline. Eugster did not.

CONCLUSION
¶ 57 Eugster acted knowingly and with intent with respect to the consequences when he refused to turn over his client's files and important papers as requested and when he filed a guardianship petition to have his client or former client declared incompetent. In so doing he violated seven ethical duties causing actual and potential harm to his client and the profession for which he is suspended from the practice of law for 18 months and ordered to pay restitution to the estate of Mrs. Stead in the sum of $13,500.
WE CONCUR: Justice SUSAN OWENS, Justice CHARLES W. JOHNSON, Justice JAMES M. JOHNSON, and Justice DEBRA L. STEPHENS.
FAIRHURST, J. (dissenting).
¶ 58 The majority describes this case as one of an attorney who has "practiced law for 34 years without a disciplinary history, and his misconduct is isolated to a single client and a single legal action lasting over approximately two months, and does not fall within the type of conduct for which disbarment is usually imposed for a first offense." Majority at 449. In so doing, the majority selectively uses the facts to arrive at the conclusion it desires: a suspension. The majority's analysis ignores that Stephen K. Eugster failed to abide by Mrs. Marion Stead's objectives and filed a guardianship petition that he knew lacked any factual or legal basis against Mrs. Stead, a vulnerable victim. If successful, the guardianship petition would have financially benefited Eugster through attorney fees, but instead, it ended up costing Mrs. Stead $13,500 and her relationship with her son. The majority's reasoning discards our well-settled attorney discipline sanction analysis in favor of a confusing, contradictory scheme that lacks any standards. I cannot join in the majority's incomplete and flawed reasoning. The only conclusion that can be drawn from our well-settled sanction analysis and precedent is Eugster should be disbarred. I dissent.

A. Sanction analysis overview
¶ 59 Although it does not follow the methodology, the majority initially correctly describes the methodology the American Bar Association (ABA) and this court have historically *453 used for assessing the sanction. After determining that an attorney has violated the Rules of Professional Conduct (RPCs), we first examine the duty violated, the state of mind, and the harm to the victim to arrive at a presumptive sanction through the lens of the ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) (ABA Standards) standards 4.0-8.0. In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 195, 117 P.3d 1134 (2005); ABA Standards at 5. The presumptive sanction serves as a starting point to the ultimate sanction. After the presumptive sanction is determined, mitigating and aggravating factors are considered to determine if the presumptive sanction should be modified. Kronenberg, 155 Wash.2d at 195, 117 P.3d 1134; ABA Standards at 5.
¶ 60 Both the hearing officer and the Washington State Bar Association (WSBA) Disciplinary Board (Board) go through this process independently to fashion a recommended sanction. In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 754, 82 P.3d 224 (2004). Both the hearing officer and Board serve important functions to be given great deference. The hearing officer is the only adjudicative body to assess the credibility of witnesses and make findings. In re Disciplinary Proceeding Against Stansfield, 164 Wash.2d 108, 125, 187 P.3d 254 (2008). The Board has unique experience and perspective in the administration of sanctions because it is "`the only body to hear the full range of disciplinary matters'" in all contested Washington disciplinary cases. Cohen, 150 Wash.2d at 754, 82 P.3d 224 (internal quotation marks omitted) (quoting In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 607, 9 P.3d 193 (2000) (Anschell I)).
¶ 61 Although we are not bound by the Board's recommendation, we will not lightly deviate from the Board's recommendation. Id.; see also In re Disciplinary Proceeding Against Anschell, 149 Wash.2d 484, 501-03, 69 P.3d 844 (2003) (Anschell II) (discussing need of the hearing officer and Board to recommend a presumptive sanction for each violation). If raised, we consider the two remaining In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 667 P.2d 608 (1983), factors before imposing sanctions: (1) the proportionality of the sanction to other instances of misconduct and (2) the extent of the agreement among the members of the Board. In re Disciplinary Proceeding Against Schwimmer, 153 Wash.2d 752, 764, 108 P.3d 761 (2005). Applying this methodology, I now analyze what sanction Eugster should receive.

B. Duty
¶ 62 We first look to the duty or duties violated to understand the type of harm and who was affected by the acts of the attorney. "The extent of the injury is defined by the type of duty violated and the extent of actual or potential harm." ABA Standards at 6. The reason we look to the duties violated is because the sanction analysis segregates itself according to whom the duty was owed. See id. at 5 (stating the first question a court imposing sanctions should answer is, "[w]hat ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)"). For example, standard 4.0 discusses the presumptive sanctions to administer when there is a violation of a duty owed to clients, standard 5.0 covers violations of duties owed to the public, standard 6.0 covers violations of duties owed to the legal system, and so forth. To determine which duties were violated, we must look to the counts of misconduct that describe the RPCs the attorney violated. Because each count can potentially involve multiple duties, we must examine the duties violated in those counts for purposes of later determining which standard should apply.
¶ 63 Here, the hearing officer, Board, and members of this court agree Eugster committed seven counts of misconduct. I will analyze those counts separately to determine which duties were violated.[1]

*454 1. Count one: violation of former RPC 1.2(a) (2002)
¶ 64 When Eugster violated former RPC 1.2(a)[2] by "fail[ing] to abide by the client's objectives of representation, which were to remove her son Roger from control of her affairs, re-take control of her financial affairs and re-claim property she believed Roger had kept in violation of her wishes," he violated a duty owed as a professional. Disciplinary Board Order Adopting Hr'g Officer's Decision with Amendments (Board Order) at 12-13. The hearing officer and the unanimous Board correctly applied standard 7.0 to determine the presumptive sanction. ABA Standards at 5.

2. Count two: violation of former RPC 1.6(a) (1990)
¶ 65 When Eugster violated former RPC 1.6(a)[3] by telling his "client's son he believed she was delusional, and when he signed a guardianship petition in which he used her personal information and set forth her financial condition and his impression of her, formed during his estate planning work he disclosed confidences relating to the representation," he violated a duty owed to the client. Findings of Fact, Conclusions of Law, Hr'g Officer's Recommendation (FOFCOL) at 12, ¶ 2.27. The hearing officer and the unanimous Board correctly applied standard 4.2 to determine the presumptive sanction. ABA Standards at 5.

3. Count three: violation of former RPC 1.8(b) (2000) and 1.9(b) (1985)
¶ 66 When Eugster violated former RPC 1.8(b)[4] and 1.9(b)[5] by "us[ing] secrets and confidences to Mrs. Stead's disadvantage," he violated a duty owed to the client. Board Order at 13; FOFCOL at 24, ¶ 3.3. Although the hearing officer and unanimous Board did not explain which standard they applied, standard 4.2 is used to determine the presumptive sanction. ABA Standards at 5.

4. Count four: violation of former RPC 1.9(a) (1985)
¶ 67 When Eugster violated former RPC 1.9(a)[6] by representing himself in the guardianship action to advance interests adverse to Mrs. Stead, he violated a duty owed to a client. Board Order at 27; FOFCOL at 15, ¶¶ 2.34, 2.35. The hearing officer and the unanimous Board correctly applied standard 4.3 to determine the presumptive sanction. ABA Standards at 5.

5. Count five: violation of former RPC 1.15(d) (1985)
¶ 68 When Eugster violated former RPC 1.15(d)[7] by failing to turn over Mrs. Stead's files despite Andrew Braff's repeated requests, Eugster violated a duty owed to a client. FOFCOL at 16, ¶ 2.38. The hearing officer and the unanimous Board correctly applied standard 4.1 to determine the presumptive sanction. ABA Standards at 5.

*455 6. Count eight: violation of former RPC 3.4(c) (1985)
¶ 69 When Eugster violated former RPC 3.4(c)[8] because he violated CR 11 by failing to make a "reasonable inquiry about Ms. Stead's mental condition," Eugster violated a duty owed to the legal system. FOFCOL at 16. The hearing officer and unanimous Board correctly applied standard 6.2 to determine the presumptive sanction. ABA Standards at 5.

7. Count nine: violation of former RPC 8.4(d) (2002)
¶ 70 When Eugster violated former RPC 8.4(d)[9] by pursuing the guardianship action against Mrs. Stead to install himself as the trustee and attorney in fact over Ms. Stead's assets, Eugster violated a duty owed as a professional. FOFCOL at 18, ¶¶ 2.42-2.45. The hearing officer and unanimous Board correctly applied standard 7.0 to determine the presumptive sanction. ABA Standards at 5-6.
¶ 71 To recap, we apply standard 4.0 to determine the presumptive sanction for the violations of duties outlined in counts two, three, four, and five; standard 6.0 to determine the presumptive sanction for the violation of the duty outlined in count eight; and standard 7.0 for the violations of duties outlined in counts one and nine.
¶ 72 The majority notes, and I agree, it is important to look at the duties themselves because we should base our sanction, in part, on to whom the attorney owed a duty. As the majority and the ABA Standards agree, the most important duty is owed to the client. ABA Standards at 5. If a lawyer violates a duty owed to a client as compared to a duty owed to the general public, the legal system, or as a professional, then we, like the ABA Standards framework, should use that fact in our sanction analysis.[10]
¶ 73 While the majority recognizes we must look to the duties violated, and even recognizes that several duties were violated here, the majority does not analyze what duties were violated. By not examining the types of duties implicated by Eugster's misconduct, the majority's approach runs counter to our established case law. See Anschell II, 149 Wash.2d at 506, 69 P.3d 844; In re Disciplinary Proceeding Against Cramer, 165 Wash.2d 323, 339, 198 P.3d 485 (2008); In re Disciplinary Proceeding Against Trejo, 163 Wash.2d 701, 723-27, 185 P.3d 1160 (2008); In re Disciplinary Proceeding Against Burtch, 162 Wash.2d 873, 897-98, 175 P.3d 1070 (2008); Kronenberg, 155 Wash.2d at 195-96, 117 P.3d 1134; In re Disciplinary Proceeding Against Lopez, 153 Wash.2d 570, 583-88, 592-93, 106 P.3d 221 (2005).
¶ 74 Instead of examining the duties, the majority uses a sleight of hand to transform the analysis to hold that Eugster's charges of misconduct can be reduced to two acts of misconduct. Majority at 447-48. The majority justifies its action by citing a statement in Schwimmer where we said we focus on the most serious act in determining the appropriate sanction because the "`ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations.'" 153 Wash.2d at 759, 108 P.3d 761 (internal quotation marks omitted) (quoting In re Disciplinary Proceeding Against Romero, 152 Wash.2d 124, 135, 94 P.3d 939 (2004)). There are several problems with this analysis.
¶ 75 The majority tries to use Schwimmer to (a) reduce the misconduct into as few separate acts as possible and (b) reduce the ultimate sanction. The majority's attempt misapplies Schwimmer. Schwimmer states that the ultimate sanction should at least be *456 consistent with the most serious sanction that could be imposed among the various violations. In order to determine the most serious sanction, we first have to determine what the presumptive sanction is for each violation. See Anschell II, 149 Wash.2d at 502, 69 P.3d 844 (stating the hearing officer and Board should examine each violation, even if the presumptive sanction for one of the violations is disbarment). Only after the Schwimmer court determined one of the presumptive sanctions was disbarment did the court cut short the analysis. It was unnecessary to examine the other charges and saved us time and pages to simply handle the issue summarily when we were a unanimous court imposing a sanction of disbarment.
¶ 76 Next, the majority's analysis of the number of acts of misconduct is not relevant to determining the types of duties violated. The number of acts is not even relevant to determining the presumptive sanction except to the extent it determines the number of RPC violations that are at issue.[11]
¶ 77 Because the majority's analysis appears to be altering our presumptive sanction analysis, I have grave concerns with the implications. The majority's holding will cause confusion for subsequent attorney discipline cases because it will now be questionable whether the hearing officers, Board, and this court should look at the duties violated. Under the majority's analysis, all counts of misconduct will be reduced into as few related episodes of misconduct as possible. It does not make sense to base the presumptive sanction on as few episodes of misconduct as possible because the point of finding the presumptive sanction is to create a standardized sanction for the attorney's actions and the resulting harm in the context of the RPCs violated. Because the majority fails to properly analyze what duties were violated, and instead simply states there were two episodes of misconduct, there is no standard like those articulated in standards 4.0-8.0 that can be used to find Eugster's presumptive sanction.

C. Mental state
¶ 78 After determining the types of duties violated, we next determine the attorney's mental state. All of our prior case law holds that we are to give strong deference to the hearing officer. See Cramer, 165 Wash.2d at 332, 198 P.3d 485 ("we often recognize that the hearing officer is in the best position to determine factual findings regarding a lawyer's state of mind and his decision is given `great weight' on review." (quoting In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 744, 122 P.3d 710 (2005))); In re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 208, 125 P.3d 954 (2006). In Anschell II, we explicitly declined an invitation to make determinations of mental state and extent of harm, stating:
We decline, for several reasons, to make the initial determination of the applicable mental state and extent of harm in connection with each of the violations. Both inquiries are factual in nature, and the hearing officer is in the best position to make such determinations based upon the evidence presented.
149 Wash.2d at 501, 69 P.3d 844. We give such deference to the hearing officer because the hearing officer is the only adjudicative body to have the opportunity to listen to the witnesses, assess their demeanor, talk to the charged attorney, and make credibility findings. See Cohen, 150 Wash.2d at 754, 82 P.3d 224. "Ordinarily we should not disturb the factual findings made by the hearing officer upon conflicting evidence." Cramer, 165 Wash.2d at 333, 198 P.3d 485. Without citation to any authority, the majority states we reserve the right to determine how much weight to give the findings of mental state. Majority at 448. By this statement, the majority enables this court to engage in credibility and factual findings. That is not our rolenor should it be.
¶ 79 We are to analyze an attorney's mental state for purposes of deriving a presumptive sanction. To determine the presumptive *457 sanction, we look to standards 4.0-8.0, using the duty violated. In those standards, with the exception of standard 4.1 (count five), the presumptive sanction generally will be disbarment if the attorney, with the intent to benefit himself or another, knowingly committed the misconduct. The presumptive sanction generally will be a suspension if the attorney acted only knowingly (without the intent to benefit himself or another).
¶ 80 The ABA Standards defines "`[k]nowledge'" for purposes of determining whether the lawyer knowingly engaged in misconduct[12] as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7; see Trejo, 163 Wash.2d at 722, 185 P.3d 1160. We have consistently treated this as a knew or should have known standard. See In re Disciplinary Proceeding Against Behrman, 165 Wash.2d 414, 421, 423, 197 P.3d 1177 (2008); Stansfield, 164 Wash.2d at 123, 187 P.3d 254;[13]In re Disciplinary Proceeding Against Egger, 152 Wash.2d 393, 416, 98 P.3d 477 (2004); In re Disciplinary Proceeding Against McKean, 148 Wash.2d 849, 870, 64 P.3d 1226 (2003).
¶ 81 In looking at whether the attorney knowingly committed the misconduct with the intent to benefit the lawyer or another, "intent" is defined as "the conscious objective or purpose to accomplish a particular result."[14] ABA Standards at 7; Stansfield, 164 Wash.2d at 123, 187 P.3d 254 (stating, "`[I]n cases where we have found an attorney acted with an intentional state of mind, generally the attorney's intent was to benefit herself or himself.'" (alteration in original) (quoting Poole, 156 Wash.2d at 239, 125 P.3d 954 (Madsen, J., dissenting))). In determining whether the attorney intended to benefit himself or herself or another, we do not look only at the statements made by the attorney regarding his or her mental state. Rather, we look at what knowledge was available and the extent to which the attorney acted in conformity with that knowledge to determine if the attorney knowingly acted with the intent to benefit himself or herself. See In re Disciplinary Proceeding Against Miller, 149 Wash.2d 262, 281, 66 P.3d 1069 (2003) (examining an attorney's actions to hold the attorney knowingly used an incapacitated client to loan him money with the intent to never repay); Poole, 156 Wash.2d at 221, 125 P.3d 954 (holding, contrary to the attorney's argument otherwise, the objective facts demonstrate an attorney acted knowingly with the intent to deceive the court). For example, if the evidence suggests the attorney knew if he or she committed certain acts, the attorney would receive a benefit to himself or herself, and the attorney took those acts, then the fact finder could find the attorney acted knowingly with the intent to benefit himself or herself.[15]
*458 ¶ 82 As the hearing officer repeatedly found, Eugster acted with the intent to benefit himself or Roger. Board Order at 26, 29; FOFCOL at 11-18, ¶¶ 2.26, 2.35, 2.38, 2.43-2.45, 3.1-3.9, 3.11. Eugster knew Mrs. Stead hired him to remove Roger's control over her estate, to return property in Roger's possession, and to draft a new will and trust. Eugster knew he drafted documents giving himself power over Mrs. Stead's estate in the event she became incompetent. He also knew Roger was a secondary trustee under the trust and had secondary power of attorney. Eugster knew if Mrs. Stead retained another attorney, Eugster would lose the power over Mrs. Stead's estate and the right to the accompanying fees.
¶ 83 With regard to count one, the evidence demonstrates Eugster knowingly failed to abide by Mrs. Stead's objectives with the intent to benefit himself or another. The proof that Eugster intended to benefit himself or Roger is that Eugster knew documents existed granting him power over Mrs. Stead's estate in the event of her death or incompetency. He knew of these documents because he drafted them. He knew he was entitled to fees when he controlled the estate, and he knew the hiring of Braff would no longer entitle Eugster to the power over the estate and the fees. Eugster's actions in refusing to recognize the termination of representation and filing the petition for guardianship was consistent with his knowledge that such acts would ensure he retained power over the estate and received the fees. More than substantial evidence exists to demonstrate Eugster acted with the intent to benefit himself.
¶ 84 With regard to counts two and three,[16] Eugster knowingly disclosed confidences and secrets to Roger, a third party, to the disadvantage of Mrs. Stead and with the intent to benefit Eugster. The analysis here is similar to that above. Eugster acted in conformity with his preexisting knowledge and coordinated with Roger to allow both of them to retain control over Mrs. Stead's estate, fees, and her person.
¶ 85 With regard to counts eight and nine,[17] Eugster knowingly filed a guardianship petition that he knew had no reasonable basis with the intent to benefit himself. First, it is beyond dispute Eugster knew he filed the guardianship petition. Second, the evidence demonstrates Eugster knew he had no reasonable basis to file a guardianship petition alleging Mrs. Stead was incompetent. At the time of filing on September 27, 2004, Eugster knew the last day he or Roger had talked to Mrs. Stead was August 4, 2004. Eugster knew that in June 2004 Mrs. Stead executed documents naming Eugster as personal representative over her will, successor trustee over her trust, and having power of attorney, and he had no concerns about Mrs. Stead's competency at that time. Eugster knew a psychologist determined Mrs. Stead had testamentary capacity during an examination in January 2004. Transcript at 413. Despite those facts, Eugster conducted no investigation to prove Mrs. Stead's incompetency by the time he filed the guardianship petition. More than substantial evidence demonstrates Eugster filed the guardianship petition knowing it lacked a reasonable basis.
¶ 86 Substantial evidence supports finding that Eugster knowingly filed the guardianship petition with the intent to benefit himself. As already mentioned, Eugster drafted legal documents granting him power over Mrs. Stead's estate should Mrs. Stead become incompetent. He knew the termination of his representation of Mrs. Stead would end his ability to retain that power over her estate. Eugster would benefit through the attorney fees he requested in the petition and the control over the estate's assets by maintaining his status as having power of attorney and being the successor trustee over Mrs. Stead's estate. By filing the guardianship petition, Eugster acted in conformity with his knowledge that Mrs. Stead's being found incompetent would preserve his control over her estate. More than substantial *459 evidence demonstrates Eugster filed the guardianship petition with the intent to benefit himself.
¶ 87 The majority's analysis suffers several glaring problems. By focusing extensively on whether Eugster subjectively intended the results of his actions, the majority contradicts itself in several areas. The majority appears to state Eugster knew he would benefit from his acts, but concludes Eugster did not intend to benefit himself. If Eugster knew his actions would lead to his financial benefit, and he took those actions, then Eugster intended to benefit himself. The majority appears to state Eugster believed Mrs. Stead was incompetent, but it also states Eugster knew he had not reasonably investigated whether Mrs. Stead was incompetent. If Eugster knew he did not have enough factual information to form a reasonable belief Mrs. Stead was incompetent, then Eugster knew there was no factual basis to file a guardianship petition declaring Mrs. Stead to be incompetent. The majority's analysis in this section becomes so confusing from these contradictions that, in the end, it never explains what mental state Eugster actually had. Majority at 447-49.
¶ 88 The hearing officer correctly concluded that, in addition to intending to benefit himself financially, Eugster had a mental state far more culpable than that of financial benefit because he substituted his judgment for that of his client for his own personal benefit. It is for this reason the hearing officer repeatedly mentions Eugster substituted his judgment for that of Mrs. Stead. FOFCOL at 19, 29-33. The hearing officer was particularly troubled that Eugster would take actions entirely contrary to the objectives of Mrs. Stead because Eugster believed he knew better and he or Roger would benefit from those actions. Id.
¶ 89 Ironically, by concluding Eugster's primary motive was to substitute his judgment for Mrs. Stead's, the majority substitutes its judgment for the hearing officer and undermines the entire findings of the hearing officer. To achieve its result, the majority removes all deference to the hearing officer, who was able to assess the credibility of the witnesses and speak with Eugster face-to-face. As we have consistently and repeatedly held, the hearing officer is in the best position to make the finding of mental state. Stansfield, 164 Wash.2d at 125, 187 P.3d 254 (holding that we defer to the hearing officer's finding of mental state over the Board's determination of mental state and stating, "[w]e give great weight to a hearing officer's determination of an attorney's state of mind because it is a factual finding"); Poole, 156 Wash.2d at 208, 125 P.3d 954; Trejo, 163 Wash.2d at 721, 185 P.3d 1160; Longacre, 155 Wash.2d at 744, 122 P.3d 710. Even the majority concludes the evidence supports the hearing officer's findings. Majority at 445-46. We should not disturb the hearing officer's findings.
¶ 90 Under the majority's analysis, to prove the charged attorney acted with intent to benefit himself or another, the WSBA must show the attorney acted in bad faith. According to the majority, if an attorney can claim he or she subjectively believed the actions were for the benefit of the client, then the lawyer did not act with intention to benefit himself or another. The majority puts Eugster's statements regarding his mental state above any contrary inference that could be drawn from Eugster's actions. Such an approach has several problems. First, the majority assumes the role as fact finder, a role this court is not qualified to play. Second, the majority creates a nearly irrefutable defense. All the attorney would have to do is claim he or she was acting for the benefit of the client and the defense would apply.[18]
*460 ¶ 91 The majority finds because Eugster wrote a letter advising Mrs. Stead to act in a manner inconsistent with Eugster's financial interest, Eugster's primary motivation was not for his financial interest. The majority confuses the analysis. We are not trying to determine if the attorney's motivation for self-benefit was greater than any other motivation. We are determining whether the attorney intended to benefit himself or another. Here, Eugster's actions were consistent with his knowledge that he would benefit by them.
¶ 92 Substantial evidence supports the hearing officer's and unanimous Board's conclusion Eugster knowingly violated the RPCs with the intent to benefit himself or another. The majority's failure to reach this conclusion, or any explicit conclusion as to Eugster's intent to benefit himself or another, creates a situation that rewards attorneys for substituting their judgment for their clients' and undoubtedly will confuse subsequent attorney discipline proceedings.

D. Harm
¶ 93 The majority correctly concludes the injury and potential injury to Mrs. Stead and the integrity of the legal profession was serious and substantial. Majority at 449.

E. Presumptive Sanction
¶ 94 To determine the presumptive sanction, we look at the duties violated, the attorney's mental state, and the extent of the injury caused. The reason we look to the duties violated is to determine which standard applies. ABA Standards stds. 4.0-8.0. Upon determining the applicable standard, we look to the attorney's mental state and the extent of the injury to arrive at a presumptive sanction. See Anschell II, 149 Wash.2d at 506, 69 P.3d 844; Cramer, 165 Wash.2d at 339, 198 P.3d 485; Trejo, 163 Wash.2d at 723-27, 185 P.3d 1160; Burtch, 162 Wash.2d at 897-98, 175 P.3d 1070; Kronenberg, 155 Wash.2d at 196, 117 P.3d 1134; Lopez, 153 Wash.2d at 583-88, 592-93, 106 P.3d 221. After determining the presumptive sanction for each count, we then start with the harshest presumptive sanction because the ultimate presumptive sanction must be at least as severe as the sanction for the most serious offense. See Anschell II, 149 Wash.2d at 502, 69 P.3d 844; In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 346, 157 P.3d 859 (2007).

1. Count one: violation of former RPC 1.2(a)
¶ 95 In count one, Eugster violated a duty owed as a professional, so standard 7.0 applies. ABA Standards standard 7.1 provides:
Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and caused serious or potentially serious injury to a client, the public, or the legal system.
Eugster knowingly filed the guardianship petition against Mrs. Stead without a reasonable investigation in response to her termination of his employment. He committed such acts for the purpose of benefiting himself, and they caused serious injury to Mrs. Stead in that she had to spend $13,500 to defend herself in the guardianship proceeding. The hearing officer and unanimous Board correctly determined under standard 7.1 that the presumptive sanction for count one is disbarment.

2. Count two: violation of former RPC 1.6(a)
¶ 96 In count two, Eugster violated a duty owed to his client to preserve confidences, so standard 4.2 applies. ABA Standards standard 4.22 states, "[s]uspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to *461 be disclosed, and this disclosure causes injury or potential injury to a client." Eugster knowingly disclosed information regarding Mrs. Stead to Roger when they prepared and filed a guardianship petition over Mrs. Stead. The disclosure resulted in a financial loss to Mrs. Stead and the loss of the relationship of her son. The hearing officer and unanimous Board correctly determined under standard 4.22 the presumptive sanction for count two is suspension.

3. Count three: violation of former RPC 1.9(b)
¶ 97 In count three, Eugster violated a duty owed to the client, so standard 4.0 applies. ABA Standards standard 4.21 provides, "[d]isbarment is generally appropriate when a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." Eugster knowingly revealed information he gained through his estate planning work for Mrs. Stead. Eugster's disclosures were not permitted by former RPC 1.9(b). The hearing officer also found Eugster acted with a selfish motive because he had a financial interest assuming control of her estate should Mrs. Stead be found incompetent. Eugster's actions humiliated Mrs. Stead, permanently damaged her relationship with Roger, and caused her to spend $13,500 litigating the matter. The hearing officer did not make any findings regarding the presumptive sanction for count three. Disbarment is the presumptive sanction under standard 4.21.

4. Count four: violation of former RPC 1.9(a)
¶ 98 In count four, Eugster violated a duty owed to the client to avoid conflicts of interest, so standard 4.3 applies. ABA Standards standard 4.32 provides, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." Eugster knowingly filed a guardianship petition against his former client while claiming it was for the benefit of the client. The petition caused injury to Mrs. Stead because she had to spend $13,500. The hearing officer and unanimous Board correctly determined under standard 4.32 the presumptive sanction for count four is suspension.

5. Count five: violation of former RPC 1.15(d)
¶ 99 In count five, Eugster violated a duty owed to the client to surrender files, so standard 4.1 applies. ABA Standards standard 4.12 provides, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." Eugster knowingly refused to turn over Mrs. Stead's files to Braff until after the conclusion of the guardianship proceeding, even after Braff repeatedly requested the files and well after Eugster had withdrawn from the guardianship proceeding. The failure to turn over Mrs. Stead's files caused injury as Braff had to recreate Mrs. Stead's files and documents. The hearing officer and unanimous Board correctly determined under standard 4.12 the presumptive sanction for count five is suspension.

6. Count eight: violation of former RPC 3.4(c)
¶ 100 In count eight, Eugster violated a duty owed to the legal process, so standard 6.2 applies. ABA Standards standard 6.21 provides, "[d]isbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding." Eugster knowingly violated CR 11 by filing the guardianship petition without reasonably investigating into the factual merits. He filed the petition with the intent to benefit himself because he would control Mrs. Stead's assets if she were found incompetent. The injury to Mrs. Stead is serious as not only did she have to spend money defending herself, but Eugster's guardianship petition *462 isolated Mrs. Stead from Roger. The hearing officer and unanimous Board correctly determined under standard 6.21 the presumptive sanction for count eight is disbarment.

7. Count nine: violation of former RPC 8.4(d)
¶ 101 In count nine, Eugster violated a duty owed as a professional, so standard 7.0 applies. ABA Standards standard 7.1 provides:
Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and caused serious or potentially serious injury to a client, the public, or the legal system.
Eugster knowingly filed a guardianship petition with no independent investigation of Mrs. Stead, whom he alleged was his client in the petition. Eugster filed the petition without Mrs. Stead's knowledge or consent. The petition was drafted in response to Mrs. Stead's termination of Eugster's representation. If the petition had been successful, Roger would have been Mrs. Stead's guardian, which was directly contrary to Mrs. Stead's objectives. The guardianship would have given Eugster control over her assets and attorney fees for his work. The filing resulted in serious injury to Mrs. Stead. Her relationship with Roger was permanently damaged and she incurred $13,500 in costs to defend herself against a baseless guardianship petition. The hearing officer and unanimous Board correctly determined under standard 7.1 the presumptive sanction for count nine is disbarment.

8. The presumptive sanction for Eugster's misconduct
¶ 102 Having identified the individual presumptive sanctions, we next determine the presumptive sanction for all of Eugster's misconduct. The sanction must be at least as severe as the sanction for Eugster's most serious violation. Four of the counts have a presumptive sanction of disbarment. As that is the most severe sanction we can impose, the presumptive sanction for Eugster's misconduct is disbarment.
¶ 103 The majority, however, holds that the presumptive sanction is a suspension. Majority at 450. The majority divines its presumptive sanction by focusing on the facts that Eugster practiced law for 34 years without a disciplinary history, his misconduct is isolated to a single client and a single legal action lasting over approximately two months, and the misconduct does not fall within the type of conduct for which disbarment is usually imposed for the first offense. Majority at 449-50. In so doing, the majority ignores our well-established case law, contradicts itself, and is outcome determinative.
¶ 104 In arriving at its presumptive sanction, the majority never mentions the duties violated, Eugster's mental state, or the injury caused. While the majority's facts can be relevant to the ultimate sanction, the presumptive sanction is not and should not be based on these facts.
¶ 105 The reason we follow the ABA Standards and our prior case law is to promote
(1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; (3) consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions.
ABA STANDARDS std. 1.3.[19] Determining the presumptive sanction by looking at the duties violated, the mental state, and the extent of injury helps serve all three of those purposes because it looks only at the misconduct and what would be a standard sanction for that type of misconduct. Determining the aggravating and mitigating factors and the proportionality *463 of the sanction later on ensures the attorney not only receives a sanction tailored to the specific acts that violated the RPCs but also that the sanction accounts for the attorney's conduct as a whole. By ignoring the well-established practice of using the duties violated, the mental state, and the extent of injury, the majority imposes a sanction based upon an incomplete analysis. Rather than looking at the relevant factors, the majority's reasoning is outcome determinative because it cherry picks the factors it deems relevant to determine the sanction it wants.
¶ 106 Under the majority's analysis, I cannot discern how hearing officers, the Board, and this court will determine the presumptive sanction in the future. It appears this court will be able to pick whatever facts will justify its conclusion. Subsequent hearing officers and Board recommendations will no longer matter, or at least matter very little. The sanction imposed will be whatever we say it is, for whatever reason we provide. That is not a standard to follow, and that is not a standard that should be followed. The majority's presumptive sanction of suspension runs counter to precedent and the ABA Standards. The majority's analysis will leave hearing officers, Boards, and this court in a confusing, contradictory state where, ultimately, the presumptive sanction will be determined by the whims of this court.

F. Aggravating and mitigating factors
¶ 107 Once we determine the presumptive sanction, we next consider any aggravating and mitigating factors. Marshall, 160 Wash.2d at 342, 157 P.3d 859. I agree with the majority that the hearing officer's and Board's findings of aggravating and mitigating factors should be affirmed. I disagree with the majority's decision to give less weight to the aggravating factor of dishonest or selfish motive because the majority misstates the standard we apply.
¶ 108 The majority reduces the weight of the factor because it believes Eugster's motive for substituting his judgment for his client's is not as important as acting for his own financial interest. But, at the same time, the majority states Eugster's substituting his judgment for Mrs. Stead's shows he "`fails to grasp the most fundamental tenant [sic] of law practice, serve your client, protect their confidences. The damage to the profession [here] is bad.'" Majority at 450 (quoting FOFCOL at 32). It is contradictory to reduce the weight of an aggravating factor of dishonest or selfish motive while also stating substituting a lawyer's judgment for his client's violates the fundamental tenet of law practice.
¶ 109 The majority also argues the weight should be reduced because the "evidence is more equivocal as to his motive to take control over Mrs. Stead's finances." Majority at 450. The majority misstates the standard we apply at this posture. While the evidence may have been equivocal during the hearing, the hearing officer was able to assess the credibility of the witnesses and render its decision. The hearing officer implicitly found Eugster not credible as to his motive and made the general finding that "Mr. Eugster has failed to be honest and trustworthy." FOFCOL at 33. A unanimous Board agreed. Yet, without stating the finding is not supported by substantial evidence, the majority reduces the weight given to the aggravating factor of dishonest or selfish motive because there was a contest of credibility. To give less weight to the aggravating factor because there is a dispute of credibility amounts to this court placing itself into the role of fact finder rather than acting as an appellate court. See Cramer, 165 Wash.2d at 332, 198 P.3d 485 (stating we give great deference to the hearing officer's findings of credibility); Stansfield, 164 Wash.2d at 125, 187 P.3d 254 (stating same). The majority errs in reducing the weight of the aggravating factor of dishonest or selfish motive.
¶ 110 Even if we were to give little or no weight to the aggravating factor of dishonest or selfish motive, there are four other aggravating factors and one mitigating factor. The majority does not examine if those factors alter the ultimate sanction. Even assuming the majority is correct, i.e., that the presumptive sanction is suspension and the aggravating factor of dishonest or selfish motive is given little or no weight, the weight of *464 the remaining aggravating factors leads to the sanction of disbarment.
¶ 111 The remaining four aggravating factors are: (1) multiple offenses, (2) vulnerability of victim, (3) refusal to acknowledge wrongful nature of conduct, and (4) substantial experience in the practice of law.
¶ 112 First, Eugster committed multiple offenses. This is not an instance of one brief episode of misconduct. Eugster not only filed a guardianship petition without reasonable investigation, he also failed to abide by his client's objectives, disclosed Mrs. Stead's confidences to Roger without her permission, and purposefully refused to return Mrs. Stead's files that rightfully belonged to her. With regard to the failure to abide by Mrs. Stead's objectives, Eugster did not just fail to abide by one of Mrs. Stead's objectives, he failed to abide by all of her objectives. He did not return her property that was in Roger's possession; he did not take steps to remove Roger's control over Mrs. Stead's assets, but instead took steps to increase Roger's control over the assets; and although not misconduct, he did not resolve the problems with the allocation of resources from Mrs. Stead's trust. Eugster committed multiple offenses through multiple independent acts. At numerous points, Eugster had the opportunity to avoid committing misconduct, yet he did not. Given the number of opportunities and the number of offenses, a harsher sanction is warranted.
¶ 113 That Eugster committed these egregious acts against a vulnerable victim also tips the scale toward imposing a harsher sanction. I need to go no further than to quote the hearing officer's justification for finding the aggravating factor of a vulnerable victim:
[Mrs.] Stead was an elderly grieving widow suffering from depression and physical health problems who had lost her husband less than six months prior to her hiring Respondent Eugster. In addition, she had recently left her home of more than twenty years, and was distraught over the state of her relationship with her only child.
FOFCOL at 22, ¶ 3.1. This court must protect victims of attorney misconduct, particularly when the attorney is out to take advantage of a vulnerable victim. As Eugster did just that, a harsher sanction is warranted.
¶ 114 The hearing officer and unanimous Board found that Eugster has refused to acknowledge the wrongful nature of his conduct. Eugster does not challenge those findings. As Eugster has shown no remorse of the wrongful nature of his conduct, a harsher sanction should be imposed.
¶ 115 Finally, Eugster has substantial experience in the practice of law. He has practiced law for 34 years, and, given his experience, Eugster should have been more attentive to the ethical duties he owed to his client, the legal profession, and the legal system. Because Eugster committed misconduct despite his substantial experience in the practice of law, a harsher sanction should be imposed.
¶ 116 There is only one mitigating factor no prior disciplinary history. The remaining four aggravating factors outweigh the mitigating factor. Each of the aggravating factors undermines the purpose of the mitigating factor, which provides leniency to an attorney for behaving appropriately until committing misconduct. Even though Eugster had no prior disciplinary history, he still committed multiple acts of misconduct, took advantage of a vulnerable client, has yet to acknowledge the harmful nature of his conduct, and should have been more attentive to his ethical duties given his years of experience. Weighing the aggravating and mitigating factors demonstrates Eugster deserves a harsher sanction than a suspension. The majority errs by not weighing the aggravating and mitigating factors at all.

G. Proportionality
¶ 117 After we determine the presumptive sanction in light of the relevant aggravating and mitigating factors, we consider whether the sanction is appropriate according to the two remaining Noble factors, but only if the disciplined attorney raises the issue. In re Disciplinary Proceeding Against Holcomb, 162 Wash.2d 563, 592, 173 P.3d 898 (2007). We generally affirm the Board's recommendation unless the sanction lacks proportionality or the Board's decision lacked unanimity. *465 Burtch, 162 Wash.2d at 900, 175 P.3d 1070; see Trejo, 163 Wash.2d at 734, 185 P.3d 1160 (stating, "we will adopt the Board's recommended sanction `unless we are able to articulate specific reasons for adopting a different sanction'" (quoting Noble, 100 Wash.2d at 95, 667 P.2d 608)). The Board agreed unanimously with the hearing officer's recommended sanction of disbarment. The only remaining Noble factor at issue is the proportionality of the sanction to the misconduct.
¶ 118 The attorney bears the burden to show how the Board's recommended sanction is not proportionate. Marshall, 160 Wash.2d at 349, 157 P.3d 859; In re Disciplinary Proceeding Against VanDerbeek, 153 Wash.2d 64, 97, 101 P.3d 88 (2004) (stating, "the attorney facing discipline must bring forth cases demonstrating the disproportionality of the sanction imposed" (citing In re Disciplinary Proceeding Against Kagele, 149 Wash.2d 793, 821, 72 P.3d 1067 (2003))). Eugster asks this court to consider our decisions in Burtch, Marshall, Poole, and Stansfield.
¶ 119 When considering whether the recommended sanction is proportionate, we consider other cases where we affirmed or rejected the same sanction. Marshall, 160 Wash.2d at 348, 157 P.3d 859. For example, the disciplined attorney in Trejo failed to prove to the court that his suspension was disproportionate by comparing it to another case where the presumptive sanction was less severe than his presumptive sanction. 163 Wash.2d at 734, 185 P.3d 1160. Like Trejo, Eugster tries to persuade the court that his presumptive sanction lacks proportionality by comparing his sanction to three cases where the presumptive sanctions were less severe than disbarment. See Stansfield, 164 Wash.2d at 129, 187 P.3d 254 (finding reprimand the presumptive sanction); Marshall, 160 Wash.2d at 350, 157 P.3d 859 (finding suspension the presumptive sanction); Poole, 156 Wash.2d at 223, 125 P.3d 954 (finding reprimand the presumptive sanction). None of the cited cases assist the court in determining whether disbarment is a disproportionate sanction.
¶ 120 Burtch, on the other hand, involves a presumptive sanction of disbarment. In Burtch, this court adopted the Board's recommendation to disbar an attorney for knowingly or intentionally "advancing a meritless defense in district court, failing to pay restitution as ordered by the Board, failing to adequately explain the fee agreement, charging unreasonable fees, and failing to return unearned fees." Burtch, 162 Wash.2d at 897, 175 P.3d 1070. The court noted Burtch had a long history of misconduct. Id. at 898, 175 P.3d 1070. The court also found ten aggravating factors but no mitigating factors to augment the presumptive sanction. Id. at 898-99, 175 P.3d 1070.
¶ 121 Eugster violated multiple ethical duties, the presumptive sanction for which is disbarment. Unlike Burtch, these RPC violations are Eugster's first disciplinary misconduct. However, the recommendation from the hearing officer and Board takes into account Eugster's unblemished record as a mitigating factor. Unfortunately, the existence of five aggravating factors outweighs the lone mitigating factor and should not compel the court to grant leniency. Eugster has failed to demonstrate how the recommended sanction of disbarment lacks proportionality.
¶ 122 The majority, in its proportionality analysis, notes Eugster's arguments regarding the cases, but with the exception of a fleeting citation to Burtch, never mentions the cases again. Instead, the majority creates a new proportionality analysis and holds that the sanction of disbarment would be disproportionate because Eugster's case does not fit into four general categories the majority creates. Majority at 450-51. We have never so generalized attorney discipline cases where the sanction was disbarment. When we have held a recommended sanction was disproportionate, we focused on the similarities between the case at issue and a particular prior case. See In re Disciplinary Proceeding Against Dynan, 152 Wash.2d 601, 623-24, 98 P.3d 444 (2004); Romero, 152 Wash.2d at 133-34, 94 P.3d 939. Such a focus was appropriate so we could impose a consistent and principled sanction based on the misconduct and the acts of the attorney. We should follow our precedent and focus on *466 the cases cited by Eugster in examining the proportionality of Eugster's sanction.
¶ 123 The majority's use of four general categories of cases where we disbarred attorneys has several glaring flaws. First, the categories are too general in nature. The majority posits we should impose individualized sanctions based on the facts, majority at 446-47, yet it tries to pigeonhole all disbarment cases into one of four general categories. I submit the better approach is to follow the step-by-step approach of determining the presumptive sanction, assessing the aggravating and mitigating factors, giving high deference to a unanimous Board, and looking at specific cases for proportionality.[20] Such an approach ensures both an individualized sanction and a sanction that is proportionate to other similar factual scenarios.
¶ 124 Next, the majority's general categories unnecessarily limit the instances when we can, and have, disbarred an attorney. In Miller, we disbarred an attorney for drafting a will that named the attorney as a beneficiary, borrowing against a client's certificate of deposit, and having a doctor declare the client incapacitated without conducting any examination. 149 Wash.2d at 268-73, 66 P.3d 1069. While the attorney's conduct was no doubt egregious, it did not technically constitute a felony, forgery, fraud, misappropriation of client funds, or an extreme lack of diligence. Similarly, in Romero, we disbarred an attorney for numerous ethical violations involving fee issues, a lack of diligence, a failure to pay income taxes, and noncooperation with the WSBA. 152 Wash.2d at 128-32, 94 P.3d 939. While the presumptive sanction for each of the violations was at most, a suspension, we held the multiple violations warranted an increase in the sanction to disbarment. Id. at 135-36, 94 P.3d 939; see also In re Disciplinary Proceeding Against Huddleston, 137 Wash.2d 560, 974 P.2d 325 (1999) (holding an attorney did not commit perjury in a civil action, but holding the attorney should still be disbarred because of his misconduct). The majority unnecessarily restricts our ability to conduct the inquiry and impose what could be an appropriate sanction.[21]
¶ 125 The majority in the proportionality analysis again states it would be unusual "to disbar a lawyer who does not have a disciplinary history for misconduct involving a single client in a single proceeding for conduct [lasting] two months." Majority at 451. First, it is incorrect to say Eugster's misconduct involved a single proceeding and only two months.[22]
¶ 126 Eugster's misconduct did not involve only one legal proceeding, and even if it did, it is not a ground for a more lenient sanction. While there was only one petition before a court, Eugster's misconduct involves more than one legal act. The hearing officer, unanimous Board, and even the majority concluded *467 Eugster failed to abide by his client's objectives, disclosed client confidences to a third party, used confidences to the disadvantage of a client or former client, failed to return papers and property to which the client was entitled, and filed a guardianship petition without making a reasonable inquiry. As the hearing officer, unanimous Board, and even the majority correctly concluded, there were multiple offenses. His offenses involve different legal acts and omissions. It was not simply one legal proceeding.[23]
¶ 127 Eugster's misconduct lasted far longer than two months. Mrs. Stead hired Eugster in August 2004, with instructions that Eugster handle estate matters and return Mrs. Stead's property in Roger's control. Eugster never returned the property, which the majority agrees constitutes misconduct. Thus, the misconduct began in August. While Eugster withdrew his name from the guardianship petition in November, Eugster did not return Mrs. Stead's files until February 2005. Eugster's misconduct spanned at least five months from August 2004 to February 2005.
¶ 128 But even if Eugster's misconduct only lasted two months, it makes no sense to reduce a sanction based on the amount of time it took to commit the misconduct. Serious misconduct can occur in a second. To base a sanction on the amount of time it took to perpetrate the misconduct creates an arbitrary analysis that has nothing to do with the actual misconduct and the injury caused. Because of the arbitrary nature, I cannot tell from the majority whether Eugster's sanction would be different if his misconduct lasted 3 months, a year, or 10 years. It makes better sense to fashion a sanction based on the amount of harm the victim suffered from the attorney's misconduct.
¶ 129 The cases cited by Eugster demonstrate the sanction of disbarment would be proportionate to his misconduct. By ignoring our case law, creating four general categories, and misapplying its own test, the majority fails to properly analyze the proportionality of Eugster's sanction. Finally, by justifying its sanction on selected facts that do not fully describe Eugster's misconduct, the majority creates an arbitrary test and disregards the ABA Standards.

H. Sanction
¶ 130 After determining the presumptive sanction, weighing the aggravating and mitigating factors, examining the proportionality, and reviewing the unanimous Board recommendation, it is clear the appropriate sanction is disbarment. Because the majority does not reach this conclusion, I dissent.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justice BARBARA A. MADSEN, and J. ROBERT LEACH, Justice Pro Tem.
NOTES
[1] Eugster was admitted to practice law in Washington in 1970.
[2] Roger is Marion Stead's child from her first marriage. To avoid confusion and for the sake of consistency with the findings of fact, we refer to Roger Samuels as Roger.
[3] Mrs. Stead's suspicion that the supplemental needs trust was overfunded proved to be true. With the assistance of attorney Andrew Braff, Mrs. Stead was able to recover three assets improperly placed in the trust. There is nothing in the record to suggest that Eugster knew anything about the funding of the trusts.
[4] Trefts wrote a letter to Roger that stated "At this time, our estimate is that one-half of her support would be approximately $2,000.00 per month. As the trustee of the John Stead Trust, we are asking that you send a check to us on a monthly basis for this amount. We will then use that check, along with her other funds, to pay for her needs." Board Ex. 55.
[5] Eugster contends that in hindsight, his concerns were justified. "After Marion hired Braff and Trefts, her estate was paying thousands of dollars for management fees which where heretofore provided for free by her son, Roger. The carefully crafted estate plan she and her husband John established with Hellenthal naming their granddaughter, Emilie, as beneficiary was completely supplanted by a will Marion signed two days before her death naming Roger's ex-wife and an animal shelter as beneficiaries." Opening Br. of Appellant at 30.
[6] Former RPC 1.13 has since been revised into RPC 1.14 (client with diminished capacity) (Sept. 1, 2006).
[7] The record reflects that Eugster prepared a durable power of attorney for healthcare, a revocable living trust, and a pour-over will that Mrs. Stead signed. However, it is agreed that the distribution of John's estate was still controlled under the plan created by the wills prepared by Hellenthal.
[8] The GAL provided a report from Mrs. Stead's treating physician, Dr. Patrick J. Shannon, MD, which concluded, "I find the patient to be competent to handle her own finances." Board Ex. 62. The GAL also interviewed 14 people who had had recent interactions with Mrs. Stead and reported their views on Mrs. Stead's state of mind. Other than Roger and Eugster, all of the individuals interviewed by the GAL reported they believed that Mrs. Stead was competent. For example: Summer Stahl, who met with Mrs. Stead the day of the GAL interview, stated, "there is no incapacity at all." Id. at 12. Dennis Sweeney, the builder and designer of the Stead's Colville home who Mrs. Stead had recently contacted to help explain the energy features of the home she was selling said, "without question, that she is able to handle her own affairs." Id. at 13-14. Mary Wear, an administrator at the assisted living facility where Mrs. Stead lived, said that she did not believe that Mrs. Stead needed a guardian for personal decisions and had not observed any problems with Mrs. Stead's finances. Id. at 14-15. Marilyn Haney, a neighbor who had last seen Mrs. Stead in September, described Mrs. Stead as "`sharp as a tack.'" Id. at 15. Lynn McCain, a friend, stated "that once in a great while, she sees confusion in Ms. [Stead]." Id. at 16. However, Ms. McCain also told the GAL that Mrs. Stead was "`witty, strong and intelligent'" and that she had never seen Mrs. Stead as anything other than capable. Id. Joyce Lingerfelt, a licensed private social worker who had been counseling Mrs. Stead since her husband passed away, said, "`I never thought she needed a guardian.'" Id. Ora Mae Sackman, a friend who visited Mrs. Stead at least two times a week, told the GAL that Mrs. Stead had "admitted to her that she need[ed] help with her finances, as her husband [John] had handled the finances prior to his death." Id. at 18-19. Ms. Sackman did not believe that Mrs. Stead understood the nature of investing but thought she could pay her own bills, but did not want to. Ms. Sackman said she believed Mrs. Stead made good decisions and that she did not need a guardian.
[9] The WSBA also alleged Eugster violated former RPC 3.4(a) (1985) (count six) and former RPC 3.3(f) (1985) (count seven). These charges were dismissed prior to the hearing.
[10] "A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to sections (c), (d), and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." Former RPC 1.2(a) (2002).
[11] The hearing officer made the same findings regarding mitigating and aggravating factors for all counts.
[12] "A lawyer shall not reveal confidences or secrets relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in sections (b) and (c)." Former RPC 1.6(a) (1990).
[13] A lawyer who is representing a client in a matter

. . . .
(b) Shall not use information relating to representation of a client to the disadvantage of the client unless the client consents in writing after consultation.
Former RPC 1.8(b) (2000).
[14] A lawyer who has formerly represented a client in a matter shall not thereafter:

. . . .
(b) Use confidences or secrets relating to the representation to the disadvantage of the former client, except as rule 1.6 would permit.
Former RPC 1.9(b) (1985).
[15] A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents in writing after consultation and a full disclosure of the material facts.
Former RPC 1.9(a) (1985).
[16] A lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

Former RPC 1.15(d) (1985).
[17] A lawyer shall not:

. . . .
(c) Knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.
Former RPC 3.4(c) (1985).
[18] It is professional misconduct for a lawyer to:

. . . .
(d) engage in conduct that is prejudicial to the administration of justice.
Former RPC 8.4(d) (2002).
[19] The WSBA alleges several procedural defects relating to Eugster's challenge. However, under RAP 1.2(c) this court may waive or alter the rules of appellate procedure to serve the ends of justice. The WSBA does not allege any injustice would arise from Eugster's noncompliance with the rules of appellate procedure. Considering the severity of the recommended sanction, we believe the ends of justice will be better served by a review on the merits.
[20] Eugster challenges the following amended findings of fact: 2.13, 2.14, 2.14.12.21, 2.24, 2.32, 2.21, 2.22, 2.26, 2.26.1, 2.35. He also challenges one original finding of fact: 2.28.
[21] Eugster makes numerous specific arguments challenging the findings of fact. We find none of them to have any merit and that all the findings of the hearing officer are supported by substantial evidence.
[22] The counts must be viewed in context. For example, here the hearing officer found that "Eugster failed to abide by the client's objectives of representation, which were to remove her son Roger from control of her affairs, re-take control of her financial affairs and reclaim property she believed Roger had kept in violation of her wishes. Respondent violated RPC 1.2(a)." AFOF 3.1. The hearing officer and the Board concluded that disbarment was the appropriate sanction, in part, because Eugster wanted to control the estate to earn fees. If Count I described disbarable misconduct when viewed in isolation, then any lawyer who failed to recover personal property, or who in the course of estate planning made recommendations as to who should act in a fiduciary capacity for the client, would do so at risk of disbarment. However, when viewed in the context of this case, the hearing officer's recommendation is not so startling.
[23] For example, a lawyer who gives his bookkeeper a check to be held in trust without instructions on which account it should be deposited cannot argue that he did not know that his bookkeeper would deposit the check into his overdrawn business account; without appropriate supervision, he either knew or should have known that the bookkeeper might deposit the check in the wrong account.
[24] In Stansfield we acknowledged that we had approved the application of the "knew or should have known" standard to a lawyer's state of mind regarding consequences (although the example we used applied to the duty violated). In re Stansfield, 164 Wash.2d at 123, 187 P.3d 254. But we then clarified that the "knew or should have known" standard is not appropriate when analyzing a lawyer's state of mind with regard to the consequences for imposing sanctions. We noted that "if we adopted the WSBA's reasoning, no misconduct would be negligent because rather than failing to heed a substantial risk, we would always assume the lawyer should have known the substantial risk." Id. at 127, 187 P.3d 254. To apply this standard in analyzing a lawyer's state of mind with respect to the consequences of the act when assessing his mental state for the imposition of sanctions would have the effect of elevating every negligent act to a knowing one.
[25] For example, in Stansfield we were confronted with former RPC 1.2(f) (2002), which provided "`[a] lawyer shall not willfully purport to act as a lawyer for any person without the authority of that person.'" In re Stansfield, 164 Wash.2d at 119, 187 P.3d 254. We can conceive of circumstances in which an employer or insurer requests a lawyer to represent its employee or insured because that person has moved or is travelling and the lawyer is unable to obtain direct authority. If, under such circumstances, the lawyer elects to file a notice of appearance solely to protect the employee or insured from a default until authority can be obtained, we do not believe that the ABA Standards demands, that the lawyer be suspended merely because he filed the notice of appearance knowingly. When determining the appropriate sanction, a separate analysis must be done to determine the lawyer's state of mind regarding the consequences of his conduct.
[26] Eugster agreed to charge $125 per hour, $25 less than his customary rate.
[27] In his opening brief, Eugster did not assign error to the hearing officer's application of the aggravating factors. See Opening Br. of Appellant at 39-40. In its answer, the WSBA noted what it perceived as a technical flaw in the hearing officer's findings and noted that the aggravating factor of dishonest or selfish motive applied to Eugster. Answering Br. of WSBA at 47 n. 19 ("The Hearing Officer repeatedly found that Eugster's misconduct was motivated by financial gain in her analysis of the charges and, therefore, the aggravating factor applies.") Under RAP 10.3(c), the reply brief "should be limited to a response to the issues in the brief to which the reply brief is directed." We consider Eugster's argument timely and permissible given that the WSBA mentioned in its answer that the aggravating factor of dishonest or selfish motive applied to Eugster.
[28] See also disciplinary actions against: Jeffrey L. Finney (offering a bribe) (May 14, 2008); Jonny Ludington-Green (first degree theft) (Jan. 17, 2007); Joel Santos Manalang (soliciting a bribe) (Aug. 15, 2007); Tyler M. Morris (accepting a bribe) (Apr. 8, 2008), available at http://pro.wsba. org/PublicDisciplineSearch.asp (last visited June 5, 2009).
[29] See also disciplinary actions against: Allen C. Hamley (July 9, 2008); Paul Hernandez (May 21, 2008); John P. Mele (May 21, 2008); Mark Todd McCrumb (Feb. 6, 2007); Roger D. Ost, Jr. (Dec. 7, 2007); Dale L. Raugust (July 18, 2007), available at http://pro.wsba.org/PublicDiscipline Search.asp (last visited June 5, 2009).
[30] See also disciplinary actions against: Lynn M. Abreu (Nov. 20, 2007); Robert N. Dompier (May 15, 2008); John B. Jackson III (Apr. 18, 2007); George T. Ryan (Dec. 28, 2007); Tracy M. Shier (Oct. 4, 2007); Darin H. Spang (Aug. 15, 2007); Robert M. Storwick (Dec. 6, 2007); Thomas P. Sughrua (Feb. 20, 2008), available at http://pro. wsba.org/PublicDisciplineSearch.asp (last visited June 5, 2009).
[31] See also disciplinary actions against: Courtenay D. Babcock (Apr. 7, 2008); Stephen B. Blanchard (July 23, 2008); Mark A. Panitch (Feb. 12, 2007); Michael O. Riley (Jan. 17, 2007); E. Armstrong Williams (Mar. 14, 2007); Gregory S. Zoro (July 9, 2008), available at http://pro.wsba.org/PublicDisciplineSearch.asp (last visited June 5, 2009).
[1] In a dissent, one does not ordinarily have to go through each violation of an RPC to assess what kind of duty was violated. However, as the majority never discusses the type of duty violated, I will explain which standard applies for each count.
[2] Former RPC 1.2(a) provides that "[a] lawyer shall abide by a client's decisions concerning the objectives of representation, ... and shall consult with the client as to the means by which they are to be pursued."
[3] Former RPC 1.6(a) provides, "[a] lawyer shall not reveal confidences or secrets relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation."
[4] Former RPC 1.8(b) provides that an attorney shall not use information relating to the representation to the disadvantage of a current client unless the client consents in writing after consultation.
[5] Former RPC 1.9(b) dictates that an attorney shall not use the confidences or secrets of a former client relating to the representation to the disadvantage of the former client.
[6] Former RPC 1.9(a) prevents a lawyer from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents in writing after consultation and a full disclosure of the material facts."
[7] Former RPC 1.15(d) provides that "[a] lawyer shall take steps to the extent reasonably practicable to protect a client's interests, ... surrendering papers and property to which the client is entitled."
[8] Former RPC 3.4(c) provides that a lawyer shall not "[k]nowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."
[9] Former RPC 8.4(d) prohibits an attorney from "[e]ngage[ing] in conduct that is prejudicial to the administration of justice."
[10] Of course, that is not to say that an attorney cannot commit serious misconduct by violating a duty owed to the general public, the legal system, or as a professional. Like the ABA Standards, we should adjust our sanction analysis according to the type of duty violated.
[11] Do not misunderstand me to argue that the number of separate acts of misconduct is not relevant to the ultimate sanction. It is, and I will provide that analysis below. I argue the majority puts the cart before the horse by looking at the number of acts without even analyzing what duties were violated.
[12] Assessing the mental state for purposes of determining the presumptive sanction involves a different analysis than determining if the attorney violated an RPC. Most RPCs (and all but one RPC violated here) do not require a finding of a mental state in order to have a violation. Unless the RPC requires, we look to the mental state only to determine the sanction. For example, except for count eight, the WSBA did not need to prove Eugster's mental state to prove a violation of the RPCs.
[13] In Stansfield, the attorney was charged with a violation of former RPC 1.2(f) (2002), which provides, "`[a] lawyer shall not willfully purport to act as a lawyer for any person without the authority of that person.'" Stansfield, 164 Wash.2d at 119, 187 P.3d 254 (emphasis added) (alteration in original). To prove a violation of former RPC 1.2(f), the WSBA had to prove Stansfield had a willful mental state. Since Stansfield, we still use the knew or should have known standard in our sanction analysis of a violation of an RPC that has no mental state element. See Behrman, 165 Wash.2d at 418, 421, 197 P.3d 1177.
[14] The majority states there are three possible mental states an attorney could haveintentional, knowing, or negligentand implies that the sanction is segregated by those mental states. Majority at 448. That distinction is imprecise. To prove Eugster should be disbarred, the WSBA was not required to prove Eugster acted intentionally. According to the ABA Standards used to determine Eugster's presumptive sanction, except for count five, the difference between a presumptive sanction of suspension and a presumptive sanction of disbarment is whether Eugster acted knowingly or acted knowingly with the intent to benefit himself or another. ABA STANDARDS stds. 4.0-8.0.
[15] This type of intent is focused on whether the attorney acted to benefit the attorney or another. It is not, as the majority hints, that the attorney has to intend all of the consequences of his or her actions.
[16] Because counts two and three both go to Eugster's disclosure of client confidences and secrets to Roger, they are combined for purposes of this analysis.
[17] Because counts eight and nine both go to Eugster's filing of the guardianship petition without conducting an adequate investigation, they are combined for purposes of this analysis.
[18] As the majority enjoys hypothetical situations to demonstrate its logic, majority at 447 n. 23, I provide my own to demonstrate the flaws in the majority's analysis: There are two attorneys. Attorney 1 knowingly withdrew money from his client's trust account, used the money to go to Tahiti and drink mai tais, and admitted to all of those facts. Attorney 2 withdrew money from her client's trust account but, instead, gave the money to a charity operated by the attorney. When questioned, Attorney 2 said she took the money out of the trust account and gave the money to the charity to help the reputation of the client. Under the majority's analysis, Attorney 1 acted intentionally and might be disbarred while Attorney 2 did not act intentionally and will not be disbarred because Attorney 2 might have acted in subjectively good faith. While there is some visceral appeal to the majority's analysis, I submit that Attorney 2 is equally, if not more, culpable than Attorney 1. In addition to benefiting herself or another (the charity), Attorney 2 denied the client the ability to dictate if and how the client would improve her reputation. Attorney 2 not only profited herself but also substituted her judgment for her clients. I submit it is bad enough Attorney 1 took the client's money for her own benefit, but Attorney 2, in addition to taking the client's money, took away the client's autonomy to define her own reputation.
[19] In the beginning of its analysis, the majority stresses the importance of flexibility and creativity in fashioning a sanction. Majority at 446. While the majority also notes consideration of all relevant factors and consistency in imposition of sanctions are also important, majority at 447, it does not recognize the ABA Standards was created to make sanctions more consistent. ABA Standards at 1.
[20] I also take issue with the majority's citation to the WSBA discipline notices posted online. Majority at 451 nn. 28-31. Those notices have no precedential value because they involve disbarments resulting from defaulted hearings or stipulations. As a result, the notices are unhelpful to determining whether a sanction is proportionate.
[21] The majority's categories do not recognize disbarment if "a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client," ABA Standards std. 4.51; if "a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client," ABA Standards std. 4.21; if a lawyer fails to avoid conflicts of interest or if "a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client," ABA Standards stds. 4.31, 4.61; or if "a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding," ABA Standards std. 6.21. The majority's categories do not even recognize disbarment of a lawyer who repeatedly commits misconduct throughout his or her career so long as the misconduct does not include a felony, forgery, fraud, a misrepresentation to a tribunal, misappropriation of client funds, or extreme lack of diligence. Majority at 450-51.
[22] Also, the fact Eugster directed his misconduct to only one client is not dispositive of his sanction. As the majority readily admits, Eugster committed multiple instances of misconduct against Mrs. Stead.
[23] The majority's use of the terms "single proceeding" and "single legal action" is unclear. Majority at 452. Such terms lack standards. It can include anything from an attorney's entire representation of a client or just one case the attorney tried for a client.